## PARIS MANUFACTURING & IMPORTING COMPANY, Appellant, v. CARLE et al., Respondents.

### St. Louis Court of Appeals, February 13, 1906.

1. **CONTRACTS: Parol Evidence to Vary Writing: Signing Contract without Reading It.** Unless some fraud is practiced to induce a party to sign a contract, he cannot avoid the obligation of the contract by denying that he knew its contents or by denying that it expressed the real agreement which he entered into.

2. ————: ————: ————: **Fraud.** Where a party signed an order for goods without reading it and in ignorance of its contents, and afterwards claimed, when the goods were shipped in accordance with the order, that the intention was not to order the goods in the amount sent, in an action for the price of the goods the evidence is examined and held that there was no substantial evidence of fraud practiced to induce the signature to the order.

Appeal from Cape Girardeau Court of Common Pleas.—
*Hon. B. F. Davis,* Judge.

REVERSED AND REMANDED (*with directions*).

*R. G. Ranney* for appellant.

(1) Verbal evidence cannot be received to add to, subtract from or vary a written instrument. Helmrich v. Geheke, 56 Mo. 79; Hunt v. Wood, 65 Mo. App. 529. (2) Where parties enter into a written contract their rights must be controlled thereby and in the absence of fraud or mistake all evidence of contemporaneous oral agreement on the same subject-matter, varying, modifying or contradicting written agreement is inadmissible. Singleton v. Fore, 7 Mo. 515; Hagar v. Hagar, 71 Mo. 610; Boyd v. Paul, 125 Mo. 9, 28 S. W. 171; Bank v. Cushman, 66 App. 102; Rothschild v.

Frensdorf, 21 Mo. App. 318; Robinson v. Jarois, 25 Mo. App. 421; Gwin v. Waggoner, 98 Mo. 315; Penn v. Brashear, 65 Mo. App. 24; Nicol v. Young, 68 Mo. App. 448. (3) Defendant's instructions 1, 2 and 3 are objectionable because: First, they are not predicated on the evidence in the case. Brownfield v. Phoenix Ins. Co., 26 Mo. App. 390; Hahn v. Cotton, 136 Mo. 216, 37 S. W. 919; Fleming v. St. Louis & S. R. Co., 101 Mo. App. 217, 74 S. W. 382.

*Robert L. Wilson,* for respondents.

The rule is fundamental, that if the minds of the contracting parties do not meet, or if they do not understand each other, there is no contract. Their minds must meet as to all the terms. Green v. Cole, 103 Mo. 76, 15 S. W. 317; Robinson v. Estes, 53 Mo. App. 378. As between original parties if one has procured the signature of the other to a written instrument, whether by fraud or not, which does not contain the contract made by the parties, but a different one, he can not be permitted to avail himself of the writing, but must stand by the real contract. Cole Bros. v. Widmaier, 19 Mo. App. 7; Beck & Pauli Lithographing Co. v. Obert, 54 Mo. App. 241.

GOODE, J.—This action was brought before a justice of the peace. The statement filed alleged that on September 18, 1903, and prior thereto, plaintiffs were partners; that on that day the defendants gave a written order to plaintiffs for goods, wares and merchandise, amounting to $180.60; that on receipt of the order, plaintiffs delivered such goods, wares and merchandise to the defendants in accordance with its terms and amounting to the sum mentioned; that defendants promised to pay plaintiffs said sum for the said goods, wares and merchandise, but refused to pay, and plaintiffs seek judgment for the debt. The evidence goes to show that a

day or two before September 18, 1903, E. B. Deane, a traveling salesman of plaintiffs, called at the millinery store of the defendants in Cape Girardeau and proposed to sell defendants a bill of goods. His conversation was with Mrs. Carle. On the next morning, he again went to the store carrying samples of perfumery which he exhibited, and afterwards took from Mrs. Carle, representing the firm of Carle & Mahn, a written order. This document is as follows:

PARIS MANUFACTURING & IMPORTING CO.,

MANUFACTURING CHEMISTS AND PERFUMERS.

Corner Main and Walnut Streets, St. Louis, Mo.

For redemption of advertising coupons we will furnish free

|  | Retail |
|---|---|
| 1 Doz. Card Perfumes ................ ........ | $1.20 |
| 1 Doz. Card Perfumes ...... ...... .... | 1.80 |
| 1-2 Doz. Perfume for Handkerchief ...... | 1.50" |

(Here follows a list of various articles concluding with):

"Total for advertising purposes ......$25.00."

(Following the above list is a list of eight articles amounting to $7.50 in value, furnished free to apply on the freight charges of the goods.)

"Warranty.—We warrant that the goods shipped will be taken from the same general stock as salesman's samples. Should any article fail to give your customer entire satisfaction we will refund the price to him or furnish a new article free of cost provided not more than one-fourth the contents has been used.

"Exchange.—Any goods in this assortment may be exchanged or returned for credit on a reorder at any time within eight months from date of invoice, or at any time thereafter provided the reorder be twice the amount returned.

"Return Cash Purchase.—Eighteen months from date of settlement if made as agreed herein, if the

amount of retail sales is less than the wholesale price of this order the Paris Manufacturing & Importing Co. agrees to buy sufficient goods back to make up the difference. The conditions of this agreement are that the customer keep the goods well and tastily displayed, use advertising provided, and by the 10th day of each month furnish us an itemized list of sales and goods on hand.

"Terms of Settlement.—One-fourth of the amount due in three months, one-fourth in six months, one-fourth in nine months and one-fourth in twelve months without interest. A discount of one per cent per month (twelve per cent per year), will be allowed for cash in ten days. The above terms of credit will only be allowed in case account is closed by notes within ten days from date of invoice: otherwise net cash thirty days. The vendor shall have a lien on all goods furnished until settlement is made.

"ASSORTMENT.

| | |
|---|---:|
| 2 Doz. Card Perfumes | $ .75 |
| 2 Doz. Card Perfumes | 1.25 |
| 3 Doz. Perfume for Handkerchief | 2.00" |

(There are thirty-four other kinds of articles in the list, of various values and making a total of $180.60. These were the goods ordered by defendant. Afterwards, the statement follows that one hundred bottles of two different sizes, with corks for same, were furnished free of charge.)

"Free with the above assortment one $24 oak show case. This case is well made, is four feet long, forty inches high and twenty-four inches deep, wood doors and shelves.

"The Paris Manufacturing & Importing Co. will send out coupons to each of one-hundred persons, the names and addresses to be furnished by customers, said coupons to be redeemed with goods furnished for such purpose in the above order and the coupons to be good

for a present of ten cents worth of goods or a credit of twenty-five cents on a fifty cent purchase.

"Neither party shall be bound except as herein expressly agreed, and time is the essence of these agreements."

"Sept. 18, 1903.

"Paris Manufacturing & Importing Co.

"Gentlemen.—On approval please ship the above mentioned goods via convenient transportation companies.

"(Customer's Signature)

Carle & Mahn,

"(P. O. Address) per Mrs. Mahn.

"Cape Girardeau, Mo.

Freight Station." . . . ."

"E. B. Deane.

"Salesman . . . . . . . .

"Exhibit A.

"James E. King, Notary Public."

Although the order is signed, "Carle & Mahn, per Mrs. Mahn," Mrs. Carle swore she signed it. It seems that the goods ordered were to be packed in a showcase, and the defense is that Deane represented to Mrs. Carle that the plaintiffs sold bills of goods amounting to twenty-five dollars, which were packed in a small show case, and other bills amounting to $180.60 which were packed in a large case; that Mrs. Carle verbally ordered a bill of merchandise amounting to twenty-five dollars to be packed in a small case and signed the order for the large bill under the impression that it was for the small one. She swore she did not read the contract over before signing it but that Deane read part of it to her and she misunderstood its terms or was misled by him regarding them. We copy portions of her testimony:

"I cannot state just the date I saw Mr. Deane first, but it was in the week that we ordered the goods, and he was in my place the third time before we made the or-

der, and that was either on the 17th or 18th, I cannot tell just which, about closing time, nine o'clock or possibly a little after. He told us the goods were a good line of goods, and that we could get either of two sizes of showcases full; there was a $25 size and another one he told us of at that time, and we said we had never handled perfumes or anything on that order, and that we would try a small sample case and were very much surprised when a large case came.

"Q. Why did you not read that order? A. Mr. Deane read me part of the order but kept it in his hands; I never had the order in my hands except to sign it.

"Q. Then when he read the order and he told you of the sizes of the cases, did you tell him what size you wanted? A. Yes, sir, and measured right on my counter just the place it would fit, and I told him I could not handle the larger case.

"Q. He measured on the counter just where it would fit? A. Yes, sir.

"Q. What did he say it would cost? A. $25 case that would be, and that is what I thought I was getting.

"Q. When the case came was it the size that he measured on your counter? A. No, sir.

"Q. What was the difference? A. Well, the case I got must have been five feet in length, it was quite a good deal larger.

"Q. How much larger? A. Well, the one I ordered was about two or two and a half feet, and this was five feet long.

"Q. You say you could not use the five-foot case as you had no room for it, and he said he could send a smaller case? A. Yes, sir.

"Q. When it came what was the size of the one you received? A. I did not measure it, I should estimate it at five feet.

"Q. Mrs. Carle, I believe you said you never read the order that Mr. Deane presented to you? A. No, sir.

"Q. Is this the order he presented to you? (Wit-

ness is shown original order.) A. I suppose it is, that is my signature, but Mr. Deane called over the amount of goods out of this order that was to be put up in the $25 order; it was never his understanding, nor mine either, that we were to get $180 worth; he was to make up a $25 order.

"Q. Did he refuse to let you read this order? A. No, sir.

"Q. How long have you been acquainted with Mr. Deane? A. Never knew him; I knew what his business was, knew his office was across the street, and that he was in and out over there.

"Q. Is this the only knowledge you had of him? A. Yes, sir.

"Q. You did not ask him to let you read this contract? A. No, sir.

"Q. Now, why is it that you did not know what you were buying? A. Because he stated to me what I was buying.

"Q. You did not ask him to see this agreement? A. No, sir; he read off what would make the $25 worth.

"Q. And you supposed you were to get the case and the goods for $25? A. A small case, not the large case, as I told him I could not handle that, as I had no room for it.

"Q. Then you supposed you were getting all these goods and the case for $25. A. Not those goods, but $25 worth of goods.

"Q. And then a case? A. No, they furnished the case, and there was no charge for the case.

"Q. The goods were only to cost you $25? A. Yes, sir: that was the amount I wanted to try.

"Q. And you refused to read the order? A. I did not refuse to read the order, but I did not read it.

"Q. You signed it? A. Yes, sir.

"Q. Now, Mrs. Carle, you said he only read a part of the order; how do you know that? A. I know that he

did not read all those articles, for I know he did not have time.

"Q. Can you state what he did read? A. No, sir; I could not tell you, but I told him to select $25 of the best articles, and we would leave it to his judgment to put up a small case.

"Q. Did he tell you this order was for $180.60? A. If I took the whole order, but it was understood that I did not take the whole order.

"Q. But he told you the order was for $180.60? A. Yes, sir; if I took the whole order.

"Q. You did not watch to see him mark out any of the order? A. He said he would put up a $25 case.

"Q. Why didn't you make him mark off the articles so as to make $25? A. That would have been proper.

"Q. You signed the order just as it was, knowing that it amounted to $180.60. A. Yes, I signed that order.

"Q. Knowing that it was $180.60? A. I knew the full order was $180.60, but I thought I was getting only $25 worth?

"Q. You knew that it called for $180.60? A. I knew all that.

"Q. You say that he told you you were only to get $25 worth? A. Yes, sir."

Deane testified that plaintiffs sold no bills of goods amounting to twenty-five dollars packed in small cases, but sold bills of only one amount. It seems that a show case was furnished free of charge to customers. Mrs. Carle testified that she measured on her counter, to see what room she could afford to give to a case, and told Deane she could use none but a small one. Deane testified that she made some objection to the size of the case on account of her lack of room, and he told her they had small cases, too, and she could put goods out of the larger case into the small one and keep the latter on the counter. He swore that this matter was talked over and

Mrs. Carle agreed to buy the goods mentioned in the written contract. He swore further that he offered to let Mrs. Carle read the contract; that he read the substance of it to her, but didn't name every article of goods; that it lay on the counter before her and she took it in her hands and signed it. On the morning the goods arrived, which was a few days after the order was given, a clerk in the store of the defendants opened the case and sold a small portion of its contents. When Mrs. Carle got to the store that morning, she repacked the goods in the case. After a correspondence in which she endeavored to have plaintiffs take the goods back and they refused to do so, she shipped them and the money received for what had been sold, to the plaintiffs by steamboat. Plaintiffs swore they never received nor saw the goods after they were shipped to defendants.

Plaintiffs requested an instruction that if the jury believe the goods were ordered in writing by defendants, the verdict must be for plaintiffs, notwithstanding the jury believed one of the defendants had told plaintiffs' salesman that defendants only wanted twenty-five dollars worth of goods. An instruction was given declaring that if defendant signed the order knowing it called for goods amounting to $180.60, the verdict must be for plaintiffs. For defendants, the court instructed that before there could be a contract of sale, the minds of the contracting parties must meet as to the terms of sale; and if the jury believed the parties to the contract in question did not fully understand and concur in it, no sale was made and the verdict should be for defendants, and if defendants were misled by the statement of plaintiffs' salesman as to the quantity of goods defendants were purchasing, and signed the contract in the belief that it contained a far less amount than it did, defendants had a right to refuse to accept the goods; and if they were reshipped to plaintiffs within a reasonable time after the mistake was discovered, the verdict must be for defendants; that if the goods shipped to defendants ex-

ceeded in value the amount of defendants' order, the latter were not bound to receive the goods but had the right to reship them to plaintiffs, and if they were reshipped, the verdict must be for defendants. The jury found a verdict for defendants and judgment having been entered on it, plaintiffs appealed.

It is apparent at a glance, that this judgment cannot stand. The case was tried and instructed on a wholly erroneous theory. The instructions to the jury left entirely out of view the question of whether defendants were fraudulently imposed on by plaintiffs' agent, and one of the instructions went so far as to give defendants the right to repudiate the contract if the plaintiffs shipped more goods than defendants ordered. There was no contention that the bill of the goods, which amounted to $180.60, exceeded the amount called for by the written order. In truth, the bill and the order exactly coincided. The only conceivable theory on which a defense could be established was, that plaintiffs' salesman fraudulently procured Mrs. Carle to sign the order by falsely stating its contents to her. In other words, that there was fraud in procuring the execution of the contract. No complaint was made about the quality of the goods, the sole objection being that plaintiffs shipped more goods than it was understood between Mrs. Carle and Deane defendants would purchase.

We are cited to certain cases in which it was said that if one party to a written contract procured the signature of the other, whether by fraud or otherwise, and the instrument did not contain the contract actually made, but a different one, the parties signing were not bound. [Beck etc. Co. v. Obert, 54 Mo. App. 241.] There are several decisions of that tenor in this State, all founded on the cases of Briggs v. Ewart, 51 Mo. 249, and Wright v. McPike, 70 Mo. 175. Those cases have been directly overruled and are no longer the law. [Crim v. Crim, 162 Mo. 544, 63 S. W. 489; Layson v. Cooper, 174 Mo. 211, 73 S. W. 472.] The rule now is that unless

some artifice or fraud is practiced to induce a party to sign a contract, the party signing cannot avoid the obligation of the instrument by denying that he knew its contents or that it expressed the real agreement. [Layson v. Cooper and Crim v. Crim, supra; Catterlin v. Lusk, 98 Mo. App. 182, 71 S. W. 1109; Magee v. Verity, 97 Mo. App. 296, 71 S. W. 472.] The exceptional instances in which a party escapes the consequences of his written obligation, are those in which, by some fraudulent contrivance, he is misled by the other party regarding the contents of the instrument, or where he was enfeebled by sickness and past understanding what he signed, or ignorant and unable to read the writing, or where some similar condition prevailed. Mrs. Carle had been in business for years, was an intelligent woman and thoroughly competent to contract. The defendants are therefore bound by the written order she gave, unless she was tricked into signing it by Deane from a fraudulent motive and without carelessness on her part. This case is indistinguishable from Layson v. Cooper and others we have cited, in which the courts held defendants could not be released from the obligations of written instruments executed by them, on the ground that the instruments were signed by the defendants in ignorance of their contents.

The only question we have been in doubt about is whether the case ought to be remanded for a trial of the issue of fraud in procuring Mrs. Carle's signature. There seems to have been some stress laid on the fact that Deane worked for a commission and was interested in increasing the order. But a study of Mrs. Carle's own testimony has convinced us that there is no substantial evidence of any fraud practiced by Deane to induce her to sign the order. He did not deceive her about its contents and she nowhere says that he did. The contract was spread before her when she signed it. Her contention is that more goods were shipped than she and Deane understood defendants were buying. She

swore she knew the order called for $180.60 worth of merchandise, and justified her refusal to receive the goods by saying that Deane understood she was only buying twenty-five dollars' worth. This evidence has no tendency to prove that Deane deceived her about the contents of the instrument. It only tends to prove that she and Deane had a verbal understanding and agreement which differed from the written one. When scrutinized, the defense is seen to be an attempt to substitute for the written agreement a verbal one; and this, of course, cannot be done.

The judgment will be reversed and the cause remanded with the direction to enter judgment in plaintiffs' favor for the amount of the bill and interest. *Bland, P. J.,* and *Nortoni, J.,* concur.