## THOS. SANDBROOK ET. AL. Respondent, v. W. L. MORRISON INVEST. CO. Appellant.

In The Kansas City Court of Appeals, February 20, 1922.

1. CONTRACTS: Evidence: Parol Evidence Admissible to Show Meaning of "$4000 Net" Used in Ambiguous Contract for Sale of Real Estate. In an action to recover the balance claimed to be due under a contract for sale of certain real estate owned by plaintiffs, the price being "$4000 net," defendant to retain from proceeds "no per cent commission on above price and 100 per cent of all of the consideration . . . above price specified," the contract being ambiguous on its face, parol evidence was admissible to show that plaintiffs were to convey only on receipt of Four Thousand Dollars ($4000) in cash above amount of a mortgage on the property and expenses, the word "price" mentioned in contract meaning "net price" defined to be that which remains after deduction of all charges and outlay.

2. ——: Construction: Doubtful Language Construed Strongly against Party Using It. Doubtful language used in a contract should be construed strongly against party using it.

3. PRINCIPAL AND AGENT: Brokers: Agent Selling Property Owned by Aged and Inexperienced Principals Must Treat Them Fairly, Disclose All Information and Not Misrepresent Facts. Where the evidence showed plaintiffs were old people and inexperienced in

business affairs, it was the duty of an agent in the sale of their property to treat them fairly, disclose all information and not misrepresent facts, as a relationship of trust and confidence existed between the parties arising from the relation of principal and agent.

4. ———: ———: **Evidence Held to Show Principals Acted Prudently in Signing, Without Reading a Contract Fraudulently Modified, so that the Rule that Parties are not Permitted to go Behind Writing Did not Obtain.** In an action by real estate agent to recover balance due under contract of sale where modified contract was brought to plaintiffs in the evening, their eyesight being poor, they were unable to read fine print in which document was written. *held* sufficient to show that plaintiffs acted with ordinary care and prudence in signing without reading the contract fraudulently represented as an extension contract so that the rule that parties to a contract are not permitted to go behind the writing did not obtain.

5. ———: ———: **Evidence Held to Show Fraud Practiced upon Principals in Procurement of Contract.** In an action to recover balance due under contract of sale of principals real estate by agent, evidence *held* to show that fraud was practiced upon principals in the procurement of extension contract.

6. ———: ———: **Whether Check was Accepted in Full Payment of All Demands by Principals Against Agent, Question for Jury.** Although a check written by agent to principals, which they cashed, contained the words "full payment," etc., *held* from evidence principals could not be held as a matter of law, to have accepted check in full payment of all demands against agent in connection with sale.

7. ———: ———: **Fraud: Instruction Erroneous in Omitting to Require Finding that Principals Were Free From Negligence in Signing, Without Reading, Contract Alleged to Have Been Procured by Fraud.** In an action against agent, by principals for balance due under contract of sale of real estate, where principals alleged fraud in the procurement of an extension contract signed by principals without reading it, an instruction to find for principals if agent made representations claimed, with knowledge of their falsity, and with the fraudulent intent claimed and principals relied altogether thereon, *held* to be erroneous as omitting reference to the acts and situation of principals which it is claimed freed them from negligence in signing new agreement, as it was not only necessary for jury to find agent misrepresented the facts but that principals did read the instrument and that there was such an excuse for their not reading it as amounted to an absence of negligence on their part.

Appeal from the Circuit Court of Jackson County.—
*Hon. Henry L. Jost,* Special Judge.

REVERSED AND REMANDED.

*Watson, Gage & Ess* and *Conger R. Smith* for respondent.

*Sebree & Sebree* and *M. M. Bogie* for appellant.

BLAND, J.—This is an action to recover the balance claimed to be due under a contract for the sale of certain real estate owned by plaintiffs in Kansas City, Missouri. There was a verdict and judgment in favor of plaintiffs in the sum of $708.58 and defendant has appealed.

The facts show that on March 27, 1920, plaintiff, Thomas Sandbrook, called at the office of the defendant in response to an advertisement and there entered into the following contract:

"To W. L. Morrison Inv. Co.  For and in consideration of One Dollar ($1) the receipt of which is acknowledge I hereby appoint you exclusive agent to make sale of the real property herein described as Lots 9 and 10 in Block 4 Co'ds Brooklyn Hill Addn. Known as 2210 E. 20th st. for the price of $4,000 net upon the following terms $—cash, cash $—secured by mortgage thereon for— year at—percent, and you are hereby authorized to accept a deposit to be applied on the purchase price, and to execute a binding contract for sale on my behalf.

In case above described property is sold or disposed of within the time specified, I agree to make the purchaser a good and sufficient warranty deed to the same and to furnish a complete abstract of title, if required; and it is further agreed that you shall have and may retain from the proceeds arising from such sale no per cent commission on the above price; and 100 per cent of all of the consideration for which said property is sold over and above price specified, and in case said property

is sold within said time either through you or any other person, then in that case I promise to pay you five per cent on the whole amount for which said property may be sold.

This contract to continue until June 1, 1920, and thereafter until terminated by notice giving unto you as agent ten days notice in writing.

Signed THOS. SANDBROOK.

Witness.''

The contract was on a printed form. The word and figures ''$4,000 net'' were inserted in long hand by defendant. Plaintiff, Thomas Sandbrook, testified, over defendant's objection, that upon going to defendant's office he saw one Colvin and told him he wanted $4000 cash for his property; that there was a first mortgage on it which was for approximately $700; that before any commission could be earned by the defendant it would be necessary for it to sell the property for enough to pay off the mortgage and to give said plaintiff the sum of $4000 in cash in addition; that Colvin then turned said plaintiff over to another employee of defendant and told the latter to writ up the contract, said plaintiff telling the latter employee the same that he had told Colvin. This employee then wrote up the contract and said plaintiff signed it. The property was owned by both plaintiffs who were husband and wife. The husband signed the contract intending to bind his wife as well as himself and his wife ratified the acts of her husband.

Nothing more was heard by the plaintiffs until about seven o'clock of June 23, 1920, when Colvin called at their home. At this time plaintiffs were seated on a bench in their yard. Plaintiff, Thomas Sandbrook, testified that Colvin told them that he had come to see them in regard to getting them to extend for ten days the time on the contract; that Colvin ''laid the paper down on the bench and asked us to sign it.'' He told them that he had ''two or three parties on the string and wanted a little more time—he wanted to extend the contract for

ten more days.'' This contract was printed in fine print as was the first one. Said plaintiff testified that the only thing Colvin said in respect to the paper he had in his hand was that ''it was a ten day's extension.'' He further testified ''I did not have my new glasses at that time . . . I could not see to read the fine print; I could not see without my glasses and did not try to read the writing; I just read the writing on the top . . . I cannot read fine print—I cannot see it very good with these glasses and with the old glasses I had I could not see it.'' Said plaintiff testified that he had been a carpenter all of his life; that he was seventy-two years of age and that ''my eyes are very weak.'' ''I was sick at the hospital at two different times and my eyes are in bad shape.'' ''When the first contract was shown me I could not read the small print.'' No money was received by plaintiffs at the time they signed the new contract on June 23, 1920.

Plaintiff, Kate Sandbrook, testified that Colvin came out to see them after supper; that the paper he had was written in fine print; that he represented that it was merely an extention of time in which to sell the property. She further testified, ''I could not see it unless I was right close to it in a good light—I could not read it that evening—I cannot read fine print very well—I have to use glasses.'' She further testified that neither she nor her husband ask Colvin to read the new agreement over nor did Colvin offer to read it. No copy of the papers was given to the plaintiffs. She further testified, ''I could see the paper that we signed but could not read the writing—I just knew it was an extension.'' The plain inference from the testimony of both plaintiffs is that they signed the paper relying upon Colvin's representation that it was merely an extension of the old contract. However, the paper turned out to be an exact copy of the contract signd on March 28th except the word ''net'' was left out and it contained the signature of Kate Sandbrook and a new date. It is apparent from the testimony of

both plaintiffs that they were inexperienced in business affairs. Colvin, testifyng for defendant, stated that it was his intention to insert the word "net" and that it was "purely omission on my part; I had intended it should be (inserted) because my understanding was that. they should receive $4,000 net for the property." It will be noted that it was unnecessary for defendant to have secured any extension of the time of the contract of March 27, for the reason that by the terms of that contract it was to continue until June 1st and thereafter until ten days after the time plaintiff should give defendant notice in writing of their intention to terminate the contract.

About June 23rd there was a contract drawn up in defendant's office providing for the sale of the property by plaintiffs to one Wimmer, a straw man. Plaintiffs came to defendant's office sometime after June 23, 1920, the day the Wimmer contract was dated, and signed the same. This contract recites that the property was sold to Wimmer for the sum of $4,000; $100 to be paid on the signing of the contract and $3900 cash on delivery of the deeds. It recited, "This contract is made subject to the ability of the W. L. Morrison Inv. Co. to so refinance the property as to pay all cash." The sellers were to pay in full all taxes and to furnish an abstract of title and the buyer was to have ten days to examine same. The contract further recites—

"If the title be good, the sellers shall deliver for the buyer at the office of said W. L. Morrison Inv. Co. Warranty Deed, properly executed and conveying said property free and clear from all liens and encumbrances whatsoever, except as herein provided."

On the day before Colvin went to plaintiffs' home and procured the new agreement from them, the defendant had sold the property to L. A. and Ruth Brown. Some days afterwards plaintiffs were asked to convey the property directly to the Browns, which they did. The treasurer of the defendant testified that on examining the

abstract it was discovered that there was a mortgage a-
gainst the property and that after the deed was signed
she told the plaintiffs that ''as soon as I pay up this loan
I will get you your money to settle that.'' Afterwards
a check payable to plaintiffs in the sum of $3073.67 was
given to plaintiff, Kate Sandbrook, at defendant's of-
fice, which had endorsed thereon, ''This check is given in
full payment of the following; Settlement of sale of 2210
East 20th St.'' This check was endorsed by plaintiffs
and cashed. Plaintiff, Kate Sandbrook, gave a receipt
which reads as follow: ''Kansas City, Missouri, 8/7-1920
Received of W. L. Morrison Inv. Co. Three thousand
seventy-three and 67/100 Dollars in full Balance due
settlement sale to O. F. Wimmer, a/c/ 2210 E-20- $3072.-
67. (Signed) Thomas Sandbrook. (Signed) Kate Sand-
brook.''

Plaintiff, Thomas Sandbrook, testified that his wife
brought the check home, showed it to him the night of
the same day and that he looked at it and saw that it
was not for the right amount. He immediately called
upon Colvin at his house in regard to the matter; Col-
vin was not at home but later in the evening he called
upon the plaintiffs. Both plaintiffs testified that they
did not see anything about ''settlement of sale'' on the
check. Plaintiff, Thomas Sandbrook, told Colvin that
night that the check ''was not the right amount at all;
I was to get $4,000 net;'' that Colvin told him that he
could not do anything and for him to ''call down there and
see Mr. Morrison.'' Plaintiff, Kate Sandbrook, testified
''When the check was given us there was not hardly
anything said to me and I was fluttered up. I don't
know what I was doing, really, and I knew that that was
not the right amount and still I didn't know what to
do and I just put the check in my pocket when I got
it and went on home.'' She signed the receipt but testi-
fied ''I did not know the words 'in full balance due
settlement of sale' '' were in the receipt.

Defendant, although demand was made of it, refused
to pay the said sum of $708.58, which represents the

amount it paid out to discharge the mortgage on the property, and this suit is to recover said amount. The petition alleges fraud in the procurement of the so-called extension agreement signed on June 23rd. The court in its instruction No. 1 told the jury that the burden was upon plaintiffs to show that Colvin obtained the signatures of plaintiffs upon the so-called extension agreement "unfairly and fraudulently" and that defendant made the "representations and statements to plaintiffs as claimed and that such statements, if made, were made by Colvin with knowledge of their falsity, and with the fraudulent purpose as claimed, and that plaintiffs relied altogether upon said representations and statements, if any, and were deceived thereby and executed said writing as a direct result thereof," and if they found the evidence on this point preponderated against the plaintiffs or was evenly balanced, their verdict should be for the defendant, but if plaintiffs proved their said contention, then the jury should disregard the writing of June 23rd. The court in its instruction No. 2 told the jury that if they found that the writing of June 23rd, "was not fairly and understandingly executed by plaintiffs within the meaning of instruction No. 1, then the next matter for you to determine is what the contract between these parties was as entered into between them on March 27, 1920." The instruction then submits to the jury that if they found from the evidence that when the contract of March 27, 1920, was entered into that there was an oral understanding between the parties that plaintiffs were to be paid $4,000 above the mortgage, their verdict should be for plaintiffs.

It is insisted by the defendant that the court erred in refusing to give defendant's instruction in the nature of a demurrer to the evidence. In this connection it is contended that there was no fraud shown in relation to the procurement of the "extension" contract. It seems to be conceded that if there was no fraud in connection with the procuring of the "extension" contract of June

23rd and the same is binding upon the parties, then the plaintiffs were not entitled to recover the amount of the mortgage because said contract did not contain the word "net" and was therefore not ambiguous upon its face and did not require the defendant to pay the mortgage. Defendant further contends that the first contract, or the one of March 27, 1920, is not ambiguous upon its face and the court erred in admitting testimony tending to vary its terms.

We will take up the latter contention first. We think that the contract of March 27, 1920, is ambiguous upon its face. It is susceptible to either of the constructions placed upon it by the parties. Defendant claims that the word and figures "$4,000 net" in the contract means "that there was to be no expenses attending the seller for making the sale." Plaintiffs contend that this phrase is susceptible to the meaning that plaintiffs were to receive $4,000 for their interest in the property over all expenses attending the making of the sale. Defendant contends that by reason of the fact that the contract provides that plaintiffs were to give a good and sufficient warranty deed and that the agent was to receive as its commission all over the net price the real estate was to sell for, that the rule that if there is an ambiguity in the contract and this ambiguity may be solved by reference to other portions of the contract, then, the contract is not susceptible to explanation by parol evidence, should be applied, and that from all the provisions of the contract it is apparent that the phrase "$4,000 net" means as defendant contends.

We do not think that other parts of the conrtact explain the apparent ambiguity in the phrase "$4,000 net." The contract is susceptible to the construction that plaintiffs were to make the warranty deed only upon the receipt of $4,000 in cash above the mortgage and expenses. In reference to the clause in the contract providing that defendant "may retain from the proceeds arising from such sale no per cent commission on the above price; and

100 per cent of all of the consideration for which said property is sold over and above specified, "the word "price" means "net" price as mentioned in the contract. The word "net" is defined to be-"that remains after the deduction of all charges and outlay;" "also, clear of all charges and deductions." [Scott v. Hartley, 126 Ind. 239, 246.] In a great many cases the word "net" as used in contracts has been declared to be of definite meaning and the contracts wherein the words was used were declared not ambiguous; in other cases the use of the word "net" has been held to make the contract ambiguous. However, whether the use of the word "net" causes ambiguity depends entirely upon the connection in which it is used in the contract. If the contract or surroundings show definitely what the charges and deductions should be in order to arrive at the net sum, then it would appear that there is no ambiguity. However, where the charges and deductions are not certain the use of the word "net" clearly gives rise to ambiguity in the contract. From a reading of this contract no one can tell what charges and deductions were to be made in arriving at the net price of $4,000 when all of the circumstances surrounding the execution of the contract are known; that is, when it is disclosed that there was a mortgage upon the property. We think that the court was clearly right in allowing testimony to be introduced tending to show what was meant by the parties when they used the phrase "$4,000 net." In this connection it will be borne in mind that this contract was written by the defendant and the rule is that doubtful language used in a contract should be construed strongly against the party using it.

In connection with this point defendant cites the cases of McPherson v. Kissee, 239 Mo. 664, and Herryford v. Turner, 67 Mo. 296. It is quite apparent from a reading of these cases they are not in point. In the first name case, at l. c. 670, it is stated—" . . . . defendant Kissee, having contracted to sell his farm subject to incumbrances in the aggregate sum of $5,000, at least

209 M. A.—39

impliedly guaranteed that it was not incumbered in any different or greater amount than named in the contract.''

There is no mention of incumbrances in the contract we are now considering. In the case of Herryford v. Turner, supra, there was no ambiguous phrase such as ''$4,000 net'' in the contract.

As to the question of fraud in the procurement of the second contract, the evidence shows that plaintiffs were old people and inexperienced in business affairs; that the relation of principal and agent existed between plaintiffs and the defendant. This created a relation of trust and confidence between the parties which made it the duty of the defendant to treat plaintiffs fairly and to disclose all information in reference to the transaction and not to misrepresent facts.

The contract of June 23rd was brought to plaintiffs in the evening and was shown to them out in their yard. Their eyesight was poor and they were unable to read the fine print in which the document was written. There was no one present except Colvin upon whom they could rely to correctly read the document to them. Colvin told them that it was merely an extension of the first agreement. When they signed the new agreement the relationship of trust and confidence existed between Colvin and plaintiffs. It was held in Breeders Company v. Wright, 134 Mo. App. 717, 721, that the rule that parties to a contract are not permitted to go behind the writing does not obtain in those instances ''where one of the parties, while acting as an ordinarily careful and prudent man in the situation would act, nevertheless is misled to his detriment by some fraudulent trick or contrivance of the other party. As, for example, where a party can not read or whose eye-sight is defective find himself in a position where he must rely on the other party to correctly read or *state* the contents of the instrument, and is deceived by false reading or *statement*.'' (Italic ours.) [See, also, Manufacturing and Importing Co. v. Carle, 116 Mo. App. 581, 591.] We think that the evidence

of plaintiffs clearly brings them within this rule and that there was evidence from which the jury might say that three was fraud practiced upon the plaintiffs in the procurement of the "extension" contract of June 23rd.

Although the check for $3073.67 given by defendant to plaintiffs, which they cashed, contained the words "full payment," etc., from the testimony in this case plaintiffs cannot be, held as a matter of law to have accepted the check in full payment of all demands against the defendant in connection with the sale of the property. [Heller v. McGilvray, 223 S. W. 970, 972.]

Complaint is made of the giving ad refusal of instructions, We find no error in the refusal of defendant's instructions but we think the court clearly erred in its instruction No. 1. Colvin at one place in his testimony testified that: "They had the contract (the "extension" agreement) in there and examined it before they signed it." "I think Mrs. Sandbrook did read it, that was my recollection." Now if plaintiffs examined and read the contract before they signed it, it would make no difference how false Colvin's representations as to its contents were. Even though he made such false representations they would not amount to fraud. [Deming Inv. Co. v. Wasson, 192 S. W. 764; Marshall Hall Grain Co. v. P. H. Boyce Mercantile Co., 211 S. W. 725, 728; Breeders Co. v. Wright, supra; Manufacturing and Importing Co. v. Carle, supra.] The instruction is founded wholly upon what Colvin said and did but says nothing about the acts and situation of plaintiffs which it is claimed freed them from negligence in signing the new agreement. It was not only necessary for the jury to find that Colvin misrepresented the facts but that plaintiffs did not read the instrument and that there was such an excuse for their not reading it as amounted to an absence of negligence on their part.

For this error the judgment must be reversed and the cause remanded and it is so ordered. All concur.