THOMAS F. CROGHAN AND HELEN F. CROGHAN, APPELLANTS, v. THE SAVINGS TRUST COMPANY, A CORPORATION, IN LIQUIDATION (O. H. MOBERLY, COMMISSIONER OF FINANCE, AND J. S. LOCKETT, SPECIAL DEPUTY COMMISSIONER IN CHARGE), RESPONDENT.—85 S. W. (2d) 239.

St. Louis Court of Appeals.   Opinion filed July 19, 1935.

Rehearing denied September 10, 1935.

*Charles A. Lich* for appellants.

*Robert J. Keefe* for respondent.

*Igoe, Carroll, Higgs & Keefe* of counsel.

HOSTETTER, P. J.—This is a suit for the allowance of a claim as a preferred one against the failed Savings Trust Company of St. Louis, being liquidated under the auspices of the State Commissioner of Finance.

Said Trust Company went into liquidation on the 12th day of January, 1933. The claim was, in due time, presented to the Commissioner of Finance, and was disallowed, and, thereupon suit was brought in the Circuit Court of the City of St. Louis, where, after a hearing, that court disallowed it either as a common or a preferred claim, and, from this action the plaintiffs bring the cause to this court by appeal for review.

The petition, omitting formal allegations, was in substance as follows:

That on May 15, 1930, plaintiffs purchased from the Savings Trust Company a registered first mortgage participation, for which they paid $4500 in cash, and, in return received Certificate No. 37, signed by the defendant Savings Trust Company, which is as follows:

"United States of America

| "The Savings Trust Co., | | The Savings Trust Co., |
| "of St. Louis, Mo. | No. 37 | of St. Louis, Mo. |
| "Dollars | | Series |
| "4,500.00 | | 1-A. |

"Registered First Mortgage Participation
"Issued by
"The Savings Trust Company
"Saint Louis

"The Savings Trust Company, of St. Louis, Missouri, hereby acknowledges the receipt of the principal sum of Forty-Five Hundred —— Dollars, in consideration of which said Company hereby agrees with Thomas F. & Helen Croghan hereinafter called the Holder, as follows:

"First: The Savings Trust Company hereby sells and delivers to the Holder a part ownership or Participation, equal to the principal and interest value hereof, in the first mortgage real estate notes, bonds or other obligations described on the reverse side hereof.

"Second: (a) Out of the interest accruing upon such deposited securities the Holder shall receive interest on said Principal sum from May 15, 1930, at the rate of 6 per cent (6%) per annum, payable semi-annually on the 15th day of November and the 15th day of May in each year, and The Savings Trust Company agrees without additional charge to act as Agent in the collection of interest as it becomes due and to disburse same to the Holders of this and other participations of this Series according to their various interests.

"(b) The Savings Trust Company agrees to re-purchase this Participation on the 15th day of May, 1933, from the moneys accrued from payment of the principal of the obligations described on the reverse side hereof, and pay the Holder hereof the principal sum and accrued interest and the Holder will thereupon assign and surrender same to the Savings Trust Company.

"Third: The Savings Trust Company shall have the right at its option to re-purchase this Participation at any time before the date hereinabove named for its purchase, upon three months' previous notice given by registered mail, and upon paying to the Holder said principal sum and accrued interest thereon at the rate above named to the date of such earlier re-purchase, after which date interest shall cease.

Fourth: Reference is hereby made to the Conditions printed on the reverse side hereof, which form a part of this Contract.

In witness whereof, The Savings Trust Company, has caused its corporate seal to be affixed hereto and these presents to be signed by two of its duly authorized officers, this 15th day of May, 1930.

"THE SAVINGS TRUST COMPANY,

" (Seal)             By JOHN J. DOWLING,

"Attest: A. E. Moore,                   President.

"Secretary."

That on the back of said obligation appeared the following printed conditions:

"CONDITIONS.

"This Participation is sold subject to the following terms and conditions:

"First: This instrument represents a part ownership or Participation in notes, bonds or other obligations, and the interest accruing thereon, secured by first mortgage or other first lien on real estate deposited with and held by The Savings Trust Company, in St. Louis, for the equal pro-rata benefit and protection of all Holders of First Mortgage Participations, The Savings Trust Company guarantees to keep on deposit in the vaults of its bank, securities of the kind above described whose aggregate principal sum shall at all times equal or exceed the aggregate principal sum of all outstanding First Mortgage Participations.

"Second: The Savings Trust Company, in consideration of its obligations to the Holder, shall be entitled to retain for its own use and benefit all interest, profit and sums received or derived from said notes, bonds other obligations in excess of the amounts, both principal and interest, to be received therefrom by the Holders of all outstanding First Mortgage Participations."

It was further set out in the petition that there were no securities or obligations described on the reverse side of the certificate but that the books and records of the defendant Trust Company showed that on May 15, 1930, there had been set up, as security for the above mentioned participation certificate, a $28,000 first deed of trust, executed by the University Church of Christ, 6912 Delmar Boulevard, covering the property at that address, dated December 1, 1927, and due and payable on December 1, 1932, and that this was the underlying security upon which their participation certificate was issued and that the issuance of such certificate created a trust in plaintiffs' favor against said $28,000 deed of trust; that the said $28,000 first deed of trust was carried by the defendant Trust Company as security for the plaintiffs' participation certificate and that said deed of trust was sold by the defendant Trust Company on February 16, 1931, and that it received payment to the extent of $28,000, and

that said sum of $28,000 was impressed with a trust in plaintiffs' favor to the extent of $4545 (that being the original amount plus interest) but that in disregard of its duties as trustee the said Trust Company turned the entire proceeds of said deed of trust into its general treasury and that the cash money and assets on hands at the time the Special Deputy Commissioner took charge of the Trust Company, therefore, included the trust fund to which plaintiffs were entitled. Wherefore, plaintiffs prayed judgment for $4545 with interest from October 20, 1933, at the rate of six per cent, and that the assets of the Trust Company be impressed with a trust in their favor to the extent of their claim and that such claim be allowed as a preferred one against the said Trust Company and for such other and further orders as they might seem to be entitled.

The amended answer contained the following, in substance:

First, a general denial; second, an averment that plaintiffs' certificate was one of a number of certificates of like kind issued by the said Trust Company and that in each of such certificates it was provided as follows:

"The Savings Trust Company guarantees to keep on deposit in the vaults of its bank securities of the kind above described whose aggregate principal sum shall at all times equal or exceed the aggregate principal sum of all outstanding first mortgage participations;" that on the 12th day of January, 1933, when said Trust Company was closed and placed in the hands of the Commissioner of Finance of Missouri for liquidation, and long prior thereto, the only security held by it as against the aforesaid participation certificate, or for the benefit of the holders of same, was a certain note in the principal sum of $13,000 secured by a mortgage or deed of trust known as the Barrett note, and mortgage; that the total face values of the participation certificates, covered by said Barrett note and mortgage, was $8500, so that the face value of said underlying note and mortgage is $4500 in excess of the face values of said certificates; that at the time when said Trust Company closed there was no balance due and unpaid upon plaintiff's participation certificate, nor was there any matured obligation for the repurchase of same, and that on May 15, 1933, being the date when said Trust Company became obligated to repurchase said certificate out of the proceeds of the security underlying the same, the said Trust Company was closed and in the hands of the Commissioner of Finance of Missouri, and, therefore, prohibited by law from performing the terms of said participation certificate and doing any business whatever; that said Barrett note and mortgage underlying the plaintiffs' and other participation certificates outstanding, has been and is being held for the benefit of the holders of said participation certificates and that the said Trust Company

under the terms of said certificates is entitled to that part, if any, of the proceeds of said underlying security in excess of the amounts receivable therefrom by the holders of said certificates; that said Commissioner and Special Deputy Commissioner have at all times since January 12, 1933, been ready and willing to turn over said underlying security to any trustee or any other person who might be duly appointed and authorized to receive and hold the same for the benefit of the parties entitled thereto, but that neither the plaintiffs nor any holder of such participation certificate have made any demands on the Commissioner or Special Deputy Commissioner in reference thereto, nor have taken any action for the purpose of having a trustee appointed to receive and hold said securities and tenders in court the said Barrett note and mortgage for such action as the court may deem proper and equitable.

The reply was a general denial.

An initial controversy arisen in respect to the first clause in the Trust Company's signed obligation to plaintiffs, headed by its as "Registered First Mortgage Participation," reading as follows:

"First: THE SAVINGS TRUST COMPANY, hereby sells and delivers to the Holder a part ownership or Participation, equal to the principal and interest value hereof, in the first mortgage real estate notes, bonds or other obligations described on the reverse side hereof."

It appearing that there were no securities described on such reverse side, plaintiffs claiming that the Trust Company, through oversight, neglected to enter and describe such securities, a part ownership or participation in which was sold to plaintiffs, and that this being a suit in equity (Bank of Poplar Bluff v. Millspaugh, 313 Mo. 412, 281 S. W. 733, loc. cit. 735, 47 A. L. R. 754), courts will consider as done what should have been done, that, therefore, the $28,000 first deed of trust executed by the University Church of Christ (known as the church loan), shown by the books of the Trust Company to have been in the participation accounts at that time will be taken as if set out and described on such reverse side of the Trust Company's said contract, whereas, defendants, in their brief, dispute this claim, and argue that the Trust Company's certificate does not indicate that any description of specific securities should be entered on such reverse side, but it rather refers to the first clause under the title of "Conditions," also on the reverse side, which designates no specific securities, but rather the kind of securities which the Trust Company obligates itself to keep in its vaults, and, in support of their argument, say that there is no blank space on the reverse side to enter a description of securities.

However, an ocular inspection of the photostatic copy discloses a blank space on the reverse side for registration (which, by the way, is still blank, being unfilled with any data in respect to regis-

tration), but even if the registration data had been written in, there would have been sufficient space left to have entered a complete description of the church loan.

If we adopt the literal interpretation of the first clause in the Trust Company's contract, it would lead to this result: that the Trust Company would, in consideration of $4500 paid it by the plaintiffs, be selling and delivering to plaintiffs a part ownership or participation in nothing, because there was no first mortgage real estate bonds or other obligations *described* on the reverse side, and as the Trust Company was only obligating itself to pay interest to plaintiffs as it should collect interest out of the securities, and had only agreed to pay the principal of plaintiffs' loan from moneys accruing from the securities described on the reverse side, it will be seen that, as "nothing can come out of nothing," such an interpretation would lead to very unreasonably and fantastic results. What is nothing? Lexicographers usually define it as nought; that which is non-existent; a nonentity. Shakespeare defines it, through the mouth of Bassanio as follows:

"Gratiano speaks an infinite deal of nothing, more than any man in all Venice. His reasons are two grains of wheat hid in two bushels of chaff, you shall seek all day ere you find them, and when you have them, they are not worth the search."—Merchant of Venice, Act 1, Scene 1.

We are therefore compelled to discard the literal interpretation of said first clause in the Trust Company's contract.

We are compelled to discard the interpretation placed on the clause by defendants, because that would lead to the equally absurd result, to-wit: that the Trust Company was selling and delivering to the plaintiffs an interest in something which at that time did not exist for it had not put into the participation account anything other than the church loan which the books of the Trust Company showed was the only security in the participation account at the time of the transaction.

Either the literal interpretation which we have suggested, that is, the Trust Company selling the plaintiffs an interest in nothing, or the interpretation placed on it by defendants to the effect that it was selling an interest to plaintiffs in something which did not then exist, as it had put up no securities other than the church loan, would convict the Trust Company of intentional fraud and wrong doing, and, inasmuch as we are required by the general holding of courts that where an act under consideration may be accounted for equally by honest motives as well as by dishonest ones, we are required to attribute the act to honesty rather than to dishonesty. So that, we adopt the claim advanced by the plaintiffs, which well comports with honest dealings by the attaches of the Trust Company, and

attribute the failure to describe the church loan on the reverse side of its obligation to an honest oversight without any intention to defraud the plaintiffs. This also is the logical and common sense view to take of it because the Trust Company overlooked making the data on the reverse side about the registration, which omission couldn't help or harm anyone, and what more natural than that it would overlook entering a description of the securities in which plaintiffs had acquired an interest. The representatives of the Trust Company in dealing with plaintiffs knew, of course, that the church loan was in the participation account and the the only object that could be accomplished by describing the church loan on the reverse side of the Trust Company's obligation, would be to make a memoranda for the benefit of the plaintiffs so that they would know in what they were buying an interest. And, no doubt, the plaintiffs, having full confidence in the managers of the Trust Company, and being confiding and unsuspicious, were perfectly willing to have them fix up the papers without any strict scrutiny or inquiry on their part. So, in accord with the principles of equity, we will assume that was done which should have been done, and that the church loan was the security which the parties in interest had in mind.

Another question at issue here is whether or not the Trust Company had the lawful right to substitute other securities at its pleasure in the place of securities already in the participation account, and, in which it had sold an interest to plaintiffs, or to other so-called "holders." It is our conclusion that it did not have such a right. As we interpret the first clause under the words "conditions," on the reverse side of the Trust Company's obligation to plaintiffs, it only means that the Trust Company will keep on deposit such securities which are sufficient to protect the aggregate sum of all outstanding first mortgage participations, that is to say, if it should issue additional so-called first mortgage participations which, in the aggregate sum, exceed the securities, then it would be its duty, under the contract, to put up additional securities to protect the holders of the participation contracts. But we do not consider that it has the right to take out of the participation account securities in which it has already sold an interest, as in the instant case, and substitute others in lieu thereof. The mere fact that such had been its custom does not give it the right. It had no more right to switch securities in which holders had an interest, without their consent, than would B have a right, if he had given a chattel mortgage to A on a horse, to substitute a cow for the horse, without A's knowledge or consent.

"A stipulation to exchange the chattels embraced in a mortgage for others will be strictly construed and will not be extended beyond

its plain terms.'' [1:1 C. J. 508; Bright v. Mack, 72 So. 433 (Ala.); Cooper v. McKee, 121 Ky. 287.]

It is hornbook law, that a contract, if ambiguous and susceptible to different constructions, should be construed most strongly against the party who prepared and handed it out to those with whom it was dealing, particularly, to those unacquainted with the business in hand. [Belch v. Schott, 171 Mo. App. 357, 157 S. W. 658; Sandbrook v. Investment Company, 209 Mo. App. 600, 239 S. W. 543; Southern R. Co. v. Berthold & Jennings Lumber Co. (Mo. App.), 247 S. W. 219; Buhler Mill & Elevator Co. v. Jolly, 217 Mo. App. 240, 261 S. W. 353; Sanders v. Sheets (Mo. App.), 287 S. W. 1069; Burrus v. Continental Life Ins. Co. (Mo. App.), 40 S. W. (2d) 493.]

The evidence discloses that the church loan of $28,000 had been in the participation account as underlying security since 1928, it was dated December 1, 1927, and matured on December 1, 1932. Payments had been made on it as follows: $2000 on December 18, 1928, $2000 some time thereafter, and another $2000 on principal January 24, 1931, leaving a balance due on said loan as of that date of $22,000.

The church loan was the only underlying security carried in the said participation account from January 4, 1928, up to and including February 16, 1931, on which last mentioned date it was repurchased and taken out of the account and the F. C. Simon first deed of trust, face value $22,000, was put in and later taken out and the Genevieve Barron first mortgage on real estate at 4214-16 McPherson Avenue, St. Louis, was then put in, and later, it was succeeded by the Barrett loan, being a first mortgage on an unimproved subdivision in East St. Louis, Illinois, which was still there when the Trust Company passed into the hands of the State Commissioner of Finance for liquidation on January 12, 1933.

It will be noted that the church loan was the only security in the participation account on May 15, 1930, when plaintiffs turned over their $4500 to the Trust Company and received its obligation labeled ''Registered First Mortgage Participation.''

The evidence further discloses that, at the time of the removal of the church loan from the participation account by the Trust Company, when the Simon loan was put into the participation account in lieu thereof, it (the church loan) had been reduced, by successive payments from $28,000 down to $22,000, and it was repurchased by the Trust Company and the following entry appears on the ledger sheet of the Trust Company, in respect thereto: ''1st. D/T. Univ. Church of Christ Rep. Credit $22,000.00.'' Which, being interpreted, indicated that the participation account was credited with $22,000 cash but the cash was not put into the account. And, not being put

into the participation account, it follows that the Trust Company retained the $22,000, the amount of the repurchase money. There was other testimony to the effect that the church loan was paid by the taking of a new loan, which was later handled by the Trust Company outside of the participation account, and, it is conceded by defendants in their brief that the notes representing the new loan were afterwards transferred by the Trust Company.

We deem the evidence sufficient to establish the fact that the proceeds of the $22,000 church loan augmented the assets of the Trust Company and were commingled with its general funds and that the church loan security and its proceeds were impressed with a trust in favor of the plaintiffs as participation holders, and, therefore, plaintiffs' claim should be allowed as preferential claim against the assets of the Trust Company. [Bank of Poplar Bluff v. Millspaugh, 313 Mo. 412, 281 S. W. 733; Commerce Trust Co. v. Farmers' Exchange Bank of Gallatin et al. (Mo. Sup.), 61 S. W. (2d) 928; Turner v. Farmers Exchange Bank (Mo. App.), 45 S. W. (2d) 1084; Mann v. Bank of Greenfield (Mo. Sup.), 46 S. W. (2d) 874.]

But it is urged by defendants that such a disposition of the case would be unfair to the general creditors of the Trust Company, and they cite cases where the assets of the institution, after being augmented by the commingling of trust funds, have been dissipated by the wrongful conduct of the persons in charge, and, that the general creditors should not be punished for the wrongdoings of such persons in dissipating such funds, in order to give to the plaintiffs what rightfully and in equity belongs to them.

However, there is no showing in the instant case that the funds of the Trust Company were dissipated by the persons in charge thereof, after the commingling of proceeds of the church loan with the general assets of the Trust Company, and the consequent augmentation of its general assets by the funds impressed with a trust in favor of plaintiffs. So far as the record in the instant case shows, the only wrongful conduct chargeable against the persons in charge of the Trust Company is the conversion of the church loan, which was impressed with a trust in favor of plaintiffs, so that its proceeds were diverted into the general assets of the Trust Company and commingled therewith, thereby augmenting the amount of the same *pro tanto*.

Besides, the allowance of plaintiffs' claim as a preferential one against the assets of the Trust Company will not be an unmixed evil to the general creditors because that clears away all of plaintiffs' rights, if any, in the $13,000 Barrett note and mortgage, which the Commissioner of Finance sets up in the answer that he is holding for the use of plaintiffs and another ''holder'' of the Trust Com-

pany's First Mortgage Participations, the latter being in the amount of $4,000 only. And, under the terms of such First Mortgage Participation contracts, the Trust Company was entitled to all of the $13,000 Barrett note and mortgage over and above the amount necessary to settle with the two holders of participation contracts, the amount of which is now reduced from $8500 to $4000.

It is also urged by defendants that there is no evidence of the value of the church loan at the time it was removed by the Trust Company out of the participation account, and no evidence that the security (the Barrett $13,000 note and mortgage), which was in the participation account at the time the Trust Company closed, was not of sufficient value to pay all outstanding participation certificates.

In respect to the church loan, it was originally a $28,000 loan, and, in a little over three years it had been reduced, by payments, to $22,000, which is an important factor in determining values, and was, at that figure, repurchase by the Trust Company and, taken out of the participation account, which amounted to an admission by the Trust Company that its value was at that time $22,000.

In respect to the Barrett $13,000 note and deed of trust, that having been placed in the participation account by substitution, which we hold was not authorized, we refrain from a discussion of its value, because that would be merely an academic question.

For the reasons hereinbefore set out, it follows that the judgment of the trial court should be reversed and the cause remanded, with directions to that court to enter up a judgment allowing plaintiffs' claim against the Savings Trust Company as a preferential one, and, it is so ordered. *Becker* and *McCullen, JJ.*, concur.