[No. 30668. *En Banc.* October 22, 1948.]

*In the Matter of the Appeals of Employees of* THE PACIFIC TELEPHONE & TELEGRAPH COMPANY.[1]

*The Attorney General* and *William J. Millard, Jr., Assistant,* for appellant Commissioner of Employment Security Department.

*McMicken, Rupp & Schweppe* and *A. V. Stoneman,* for appellant The Pacific Telephone and Telegraph Company.

*Joseph D. Holmes,* for respondents.

*Grosscup, Ambler & Stephan, amicus curiae.*

[1] Reported in 198 P. (2d) 675.

SCHWELLENBACH, J.—This is an appeal from a judgment reversing the decision of the commissioner of the employment security department.

Prior to the events which gave rise to this controversy, four unions had been formed in this state by the employees of The Pacific Telephone and Telegraph Company, namely: Associated Communications Employees (plant); Associated Communications Employees (traffic); Associated Communications Employees (commercial); Associated Communications Employees (accounting). Although the four unions had the same name, each organization was independent of the other, with its own officers and place of meeting.

On March 7, 1947, the company received a thirty-day notice of intent to strike from the National Federation of Telephone Workers. Demands were made for improved wages, working conditions, union security, and other factors. Negotiations continued, during the thirty-day period, between the company and the plant union.

Negotiations were futile, and, about six o'clock a. m., April 7, 1947, pickets (members of the plant union) appeared at the various premises of the company in Spokane, Seattle, and Tacoma, at which the claimants were employed, and established picket lines at the entrances normally used by employees reporting to work. The strike lasted until May 15, 1947, at which time normal operations were resumed. When the dispute ended, all employees belonging to the four unions returned to work at an increase in wages.

Originally the picket lines were maintained only by members of the plant union. However, the other employees (claimants herein) refused to go through the picket lines, although their jobs were at all times available to them. There was no violence or forceful effort made to prevent claimants from working. But these employees had heard of violence in the East; had heard rumors that probably pictures would be taken of anybody trying to enter the building; or that they would be branded as "scabs." The telephone operators testified that they were kept from their

jobs through fear; some because of their husbands' jobs; some because they were just afraid to cross picket lines. Although in Spokane and Seattle only members of the plant union maintained the picket lines, in Tacoma, toward the end of the strike, some telephone operators also acted as pickets.

Claims were filed for unemployment compensation, which were denied on the ground that the claimants were taking part in a labor dispute. Appeals were taken to the commissioner, who held hearings in Spokane, Seattle, and Tacoma. The commissioner found that the claimants were unemployed due to a stoppage of work existing because of a labor dispute and were thus disqualified by § 77 of the unemployment compensation act, as interpreted by this court. Benefits were denied each claimant for the period from April 7, 1947, through May 14, 1947. Court appeals for review were instituted, were consolidated for trial, and were heard by the superior court for Pierce county. The trial court reversed the decision of the commissioner and awarded each of the claimants unemployment compensation benefits for the period from April 7, 1947, to May 15, 1947, inclusive, with the exception that four named claimants in Tacoma, who acted as pickets, were awarded such compensation for the period from April 7, 1947, to May 6, 1947, inclusive.

Section 77 of the unemployment compensation act (Rem. Supp. 1945, § 9998-215), provides:

"An individual shall be disqualified for benefits for any week with respect to which the Commissioner finds that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed: *Provided,* That this section shall not apply if it is shown to the satisfaction of the Commissioner that

"(a) he is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(b) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute: *Provided,*

That if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this subdivision, be deemed to be a separate factory, establishment, or other premises."

In *In re Polson Lbr. & Shingle Mills,* 19 Wn. (2d) 467, 143 P. (2d) 316, we said:

"It should be noted here that nowhere in the act is the term 'labor dispute' defined. We are of the opinion that the legislature deliberately failed to define that term, for the reason that it realized that any attempt to define that term might result in a definition which would not meet conditions arising in the future. The legislature therefore left this question to be determined by the commissioner."

*In re St. Paul & Tacoma Lbr. Co.,* 7 Wn. (2d) 580, 110 P. (2d) 877, was an appeal from a judgment reversing, in part, a decision of the commissioner holding claimants ineligible for benefits. There, members of the C.I.O. were on strike,· and members of the A. F. of L., who were not on strike, refused to go through the picket line. After holding that it was not within the province of the courts, on appeal from a decision of the commissioner, to resolve conflicts in evidence, we said:

"In view of the foregoing, the findings by the department to the effect that the only reason for the unemployment of these men was their refusal to pass through the picket line established by the group which called the strike, should not have been reversed, since there was substantial evidence upon which such findings were based and there was no indication that the commissioner acted arbitrarily or capriciously.

"The next question with which we are confronted, therefore, is whether a refusal by nonstriking workers to pass through the picket line established by another union constitutes 'participating in' the labor dispute within the meaning of the act.

"It is obvious that such a refusal does constitute participation, since, by so refusing to work, the persons are adding their strength to the cause of the strikers, who are then put in a better bargaining position when the entire plant is shut down than when their branch of it has stopped only a portion

of the operations. The refusal to pass through the lines under the circumstances present in the case at bar disqualified the workers. The mere fact that the passage through the picket lines was contrary to their union convictions was not enough to make their refusal involuntary, since they had a legal right to pass the lines if they so desired. Having found that these men participated in the dispute, it is unnecessary to determine whether or not they were of the same class as the strikers or whether the portion of the company's work they were doing was commonly conducted as a separate business."

■■■ The trial court recognized that § 77 of the act was controlling at the time of the decision of *In re St. Paul & Tacoma Lbr. Co., supra,* decided February 25, 1941. However, the trial court was of the opinion that the legislature, by amending § 78 in 1943, placed additional responsibilities on the commissioner in his determination as to whether or not a "labor dispute" existed. We quote § 78, as amended (Rem. Supp. 1945, § 9998-216), italicizing those portions which have been added:

"In determining whether or not any such work is suitable for an individual *or whether or not an individual has left work voluntarily without good cause,* the Commissioner shall consider the degree of risk involved to his health, safety and morals, his physical fitness and prior training, *his experience and prior earnings,* his length of unemployment and prospects for securing local work in his customary occupation, the distance of the available work from his residence, *and such other factors as the Commissioner may deem pertinent, including state and national emergencies."*

We fail to see where § 78, as amended, applies to § 77. That section sets up one item of disqualification for benefits. It is titled, "Labor Dispute Disqualification." It is separate and distinct from the other sections. On the other hand § 73 (Rem. Supp. 1945, § 9998-211) is as follows:

"An individual shall be disqualified for benefits for the calendar week *in which he has left work voluntarily without good cause,* if so found by the Commissioner, and for a period ensuing immediately thereafter of not more than four weeks as the Commissioner shall determine." (Italics ours.)

The amendment to § 78 modifies § 73, but it is in no sense a modification or enlargement of § 77.

 The commissioner correctly applied the law to the facts in holding that the claimants were unemployed due to a stoppage of work existing because of a labor dispute at the premises at which each was last employed, and thus disqualified by § 77 of the act to receive benefits thereunder.

The judgment of the trial court is reversed.

BEALS, STEINERT, ROBINSON, SIMPSON, and JEFFERS, JJ., concur.