PHILLIP MEYER ET AL., PLAINTIFFS-RESPONDENTS, v. INDUSTRIAL COMMISSION OF MISSOURI ET AL., (DEFENDANTS), FULTON IRON WORKS CO., A CORPORATION, DEFENDANT-APPELLANT.—223 S. W. 2d 835.

St. Louis Court of Appeals. Opinion filed October 18, 1949.

Respondents' motion for a rehearing or, in the alternative, to transfer cause to Supreme Court of Missouri, overruled November 18, 1949.

Respondents' application to transfer from St. Louis Court of Appeals denied by the Supreme Court on January 9, 1950.

*Thompson, Mitchell, Thompson & Young, John O. Hichew* and *James P. Brown* for appellants.

*Bartley & Bartley* and *Malcolm L. Bartley* for respondents.

*John L. Porter* for Amicus Curiae, Division of Employment Security.

.WOLFE, C.—This action was brought in the Circuit Court for judicial review of a final decision of the Industrial Commission of Missouri. The Commission had denied unemployment compensation, but upon review of the record the Circuit Court set aside the finding and decision and remanded the cause with directions to find in favor of the plaintiffs. It is from this judgment that the defendants appeal.

It is the contention of the defendants and the finding of the Industrial Commission that the plaintiffs were disqualified for unemployment benefits under Section 9431 II(a), R. S. Mo. 1939, Mo. R. S. A., as amended by Laws of Missouri, 1943, p. 937, which provides in part as follows:

"II. An individual shall be disqualified for benefits under the following conditions and in each case the weeks of such disqualification shall not be counted as any part of the waiting period.

"(a) For any week with respect to which the Commission finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute in the factory, establishment or other premises in which he is or was last employed: * * * and provided further, that this subsection shall not apply if it is shown to the satisfaction of the Commission that

"(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(2) He does not belong to a grade or class of workers of which, immediately preceding the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute."

It was agreed that a work stoppage occurred at the plant of defendant Fulton Iron Works Company on June 10, 1946, and that the stoppage was due to a labor dispute. The dispute involved a demand for a wage increase by the International Molders and Foundry Workers Union of American, Local No. 59, and did not concern the International Association of Machinists to which the plaintiffs belonged. Plaintiffs sought to show that they came within the statutory exceptions to the statutory disqualification in that they did not participate in the molders' strike nor aid in financing it, and they were not directly interested in it. They also sought to show that they were not the same grade or class of workers as the molders.

There were 132 claimants seeking unemployment compensation upon the same state of facts, and it was agreed that the testimony of a limited number would apply to all.

The Fulton Iron Works Company, a corporation, operates a plant in St. Louis County, Missouri. It has two major divisions of work separately housed. One is a foundry which makes large castings that

are carried to the other division where they are machined. About 125 men are employed in the foundry and they belong to the International Molders and Foundry Workers Union, Local No. 59. In the machining department about three hundred men are employed and they belong to the International Association of Machinists, District No. 9. Both of the unions are the recognized bargaining agents for their respective members. Each union is a separate organization and has no affiliation with the other.

The machinists' union had just completed negotiations for a new labor contract which was to be effective as of June 1, 1946, and this union had no grievance or dispute with the employer. The contract was not in final written form on June 10, when the molders' union called a strike and established a picket line at the plant of the Fulton Iron Works Company. The machinists were not benefited in any way by the strike and did not join in the picketing or urge others to respect the picket line. They were not requested to aid or support the molders' strike and did not contribute financially to it. Neither did the machinists' union pay its members any strike benefits while the strike was in progress. The officers of the machinists' union did not direct the machinists to respect the picket line and the union had no rule specifically prohibiting a member from crossing another union's line, and neither did the union assess a penalty for so doing.

In addition to these two large groups of employees the defendant company employed cranemen who operated the cranes that moved the castings to the machining department. Most of the work was on heavy castings of several hundred pounds in weight and the crane operators would "set" such work for the machinists. Few cranemen were used because some of the machining jobs after being "set", required from forty to sixty hours for completion.

The plaintiffs did not know that the molders planned to call a strike and they were first informed that one had been called when they reported for work on June 10, 1946, and saw pickets before the employees' entrance to the plant. The picket line was made up of twenty or twenty-five men in single file who passed in a circular procession, a pace behind each other, before the entrance. Other molders were near the entrance and some were seated in automobiles parked in the vicinity.

None of the plaintiffs tried to cross the picket line and those who testified stated that they were afraid to do so.

Robert E. Clark, a machinist, testified that as he walked toward the employees' entrance on the morning of June 10, one of the pickets stepped out of the line and asked him where he was going, and the testimony continues as follows:

"Q. Now, this man came from where? The one who asked you a question. A. He came from the picket line.

"Q. From the picket line? A. I found afterwards it was a picket line.

"Q. And what happened when he approached you?' A. I says, 'Well, I come to report for work.' He says, 'Well, there's no work here this morning.' He says, 'The molders are on strike.' 'Well,' I says, 'Does that keep the machinists out?' He says, 'Well, no, not necessarily, but I wouldn't advise you to go in.'

\* \* \* \* \* \* \*

"Q. What happened after that statement was made? A. Well, I said, 'I don't see why. We have no grievance with the company.' 'Well,' he says, 'we have, and we don't want anybody to go in while we are out.'

"Q. Now, did this man, when he was speaking to you, had he left the picket line and was speaking to you, or was he still in the picket line while he was speaking to you?' A. He left the picket line.

"Q. And what were the other men who remained in the picket line doing while he was talking to you? A. Well, some of them kept walking and two or three of them stopped to hear the conversation.

"Q. And after you had this conversation, what did you do? A. Well, I figured the best thing for me to do was not try to go in and see what developed."

A witness named Williford, who belonged to the machinists' union, arrived at the plant on the morning of June 10, and one of the pickets said to him: "If you are planning on go'ng in there, or any of your buddies are planning on going in there, you can tell them there will be plenty of trouble if they do." After this conversation Williford left. He stated that the picket was "belligerent" and "pugil'stic" and said that he "did not cross the picket line because I knew this fellow or some one else would punch my head if I did."

Others testified to similar statements made by the molders who were in the picket line or gathered together in a nearby barroom. None of the pickets were armed and there is no evidence that there was any violence, although the strike continued for a number of weeks.

There was testimony that the cranemen left the plant after the strike started, but some work remained for the machinists to do if they had returned to their jobs.

There is also testimony that the molders' union had refused permission to the machinists' union to cross the line at another plant where a strike was in progress, but the plant at which this occurred was in no way connected or affiliated with the defendant company. The business agent for the machinists' union asked permission to cross the line for the purpose of having the contract his union had negotiated with the Fulton Company signed, and the line was withdrawn for this purpose.

1030

Upon these facts the Commission found that the plaintiffs had participated in the work stoppage and had not therefore brought themselves within the statutory exemptions.

It seems to stand without dispute that one who voluntarily refuses to cross the picket line to go to his work is participating in work stoppage. This is true regardless of the fact that he may not profit by the strike since by refusing to work he has added his strength to the cause of the strikers and placed them in a better bargaining position. The statute attempts to reach a neutral position between the employer and employee by the provision denying benefits when the unemployment is due to a strike and further providing that no one who is unemployed shall be denied benefits because of refusing to fill a position where the vacancy is caused by a strike. Section 9431 II. (a), Laws of 1943, p. 937. In re Persons employed at St. Paul & Tacoma Lumber Co., 7 Wash. (2d) 580, 110 P. (2d) 877; Bodinson Mfg. Co. v. California Employment Commission, 17 Cal. (2d) 321, 109 P. (2d) 935; Matson Terminals, Inc., et al., v. California Employment Commission et al., 24 Cal. (2d) 695, 151 P. (2d) 202; Aitken et al. v. Board of Review of Unemployment Compensation et al., 56 A. (2d) 587; Brown et al. v. Maryland Unemployment Compensation Board (Md.), 55 A. (2d) 696; Steamship Trade Ass'n. of Baltimore et al. v. Davis et al., 57 A. (2d) 818.

The question for determination here is whether or not the refusal to cross the picket line was voluntary in view of the conduct of the pickets and by reason of the testimony of the witnesses that they were afraid to cross the line. Generally, a voluntary act is an act of one's own choice and the motives that cause the choice to be made do not enter into the question. Such a conception of the word "voluntary" however presupposes freedom to choose a course of action, and so in determining whether or not the refusal to cross the line was a voluntary act we must decide whether there was any restraint that prevented the workers from doing so. Such restraint might be actual physical restraint or it might be such conduct on the part of the pickets as to reasonably give rise to a fear of bodily injury.

The findings of the Appeals Referee, which were accepted by the Division of Unemployment Security, stated:

"From the facts, the Referee does not find that the claimants herein concerned had actual reason to fear violence and bodily harm at the hands of those who were in the picket line which confronted them or at the hands of those who appeared ready to support the picket line. Although the picket line was maintained for a number of weeks, the testimony given by and on behalf of the claimants did not reflect a single act of violence, or even a direct threat of actual injury to anyone, by those so participating. Obviously, the appearances and acts of those participating in the picket line were merely those of pickets who were diligently

attempting to persuade others against entering the company's premises for work, but who were not illegally molesting or offering actual threat of injury to anyone."

Upon review the Circuit Court held to the contrary.

It was stated by this Court in Moore v. International Shoe Co., Mo. App., 213 S. W. (2d) 215, that the Court upon review "* * * is authorized to determine, upon the whole record, whether the Industrial Commission could reasonably have made its findings and reached its result. Const. of Mo., 1945, Art. V, Sec. 22, Mo. R. S. A.; Wood v. Wagner Electric Corporation, 355 Mo. 670, 197 S. W. (2d) 647; Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S. W. (2d) 55. This does not mean that we are to arrive at our conclusion solely upon a review of the whole evidence and with a total disregard of the fact that the Commission made its final award in favor of the employee, and thereby substitute our judgment on the evidence for that of the administrative tribunal. It is our duty to decide from the whole of the evidence whether the Commission could have reasonably found in favor of the employee as it did. We are not to set aside that finding unless it was clearly contrary to the overwhelming weight of the evidence."

Williams v. International Shoe Co., Mo. App., 213 S. W. (2d) 657. These cited cases deal with Workmen's Compensation but the same rule applies to the review of Unemployment Compensation cases as the Constitution of Missouri, 1945, Art. V, Sec. 22, Mo. R. S. A., is applicable to both. A. J. Meyer & Co. v. Unemployment Compensation Commission, 348 Mo 147, 152 S. W. (2d) 184.

The determination of this case rests chiefly upon whether or not the Commission could have reasonably arrived at the finding that the machinists did not have actual reason to fear bodily harm at the hands of the pickets. If such a finding could have been reasonably reached from all of the evidence then the trial court erred in reversing the finding.

Construing a similar statute in the case of Bodinson Mfg. Co. v. California Employment Commission, 17 Cal. (2d) 321, 109 P. (2d) 935, the Court said:

"If the picket line was maintained within the limits permitted by law, as this one presumably was, no physical compulsion was exerted to prevent correspondents from working."

And in Steamship Trade Ass'n. of Baltimore et al. v. Davis et al., 57 A. (2d) 818, the Court stated:

"The courts must presume that strikers are law-abiding. There must be more than a mere theatrical threat of violence. The fear of violence must be real and not nebulous. Just because claimants say that they are afraid of the pickets is not

enough and the mere presence of the pickets is not enough to excuse claimants from crossing p'cket lines."

In the absence of proof to the contrary, we must indulge in the presumption that the picket line was maintained and conducted in an orderly manner and with no intention to violate the law. Bodinson Mfg. Co. v. California Employment Commission, supra; Brigham City Fruit Growers' Ass'n. v. G. H. Zollmann Produce Co., Mo. Sup., 220 S. W. 911; Bradshaw v. Metropolitan Life Ins. Co., Mo. App. 110 S. W. (2d) 834; Croghan v. Savings Trust Co., 231 Mo. App. 1161, 85 S. W. (2d) 239. The evidence was that one picket said "I wouldn't advise you to go in" and another picket said, "If you are planning on going in there, or any or your buddies are planning on going in there, you can tell them there will be plenty of trouble if they do", and still another said that "it would not be healthy." These and similar remarks by the molders could reasonably have been classified by the Referee as mere blustering bravado. It would not be logical to say that the evidence presented was sufficient, as a matter of law, to overcome the presumption that the molders were lawful and orderly and if they were lawful and orderly the machinists had no reason to fear bodily harm. The machinists had the legal right to go to their work but none of them said "We are going to cross your line", and none of them attempted to do so. There was no violence or direct threat against anyone. The Commission could upon the state of facts presented properly find that the machinists had no actual reason to fear that the molders would have illegally restrained them from working. This appears to be the most logical conclusion to be drawn from all of the evidence.

However, if the point were one upon which triers of the facts might well differ, we are confronted with the law as pronounced by this Court in Ashwell v. United States Seed Co., Mo. App., 167 S. W. (2d) 950:

"It frequently happens that there is no testimony in a case other than that of the plaintiff or claimant himself, but if from that testimony two different conclusions or inferences may be drawn as to the ultimate fact at issue, each of such conclusions or inferences being consistent with the testimony, and each inconsistent with the other, it remains for the triers of the facts to determine the issue and draw the inference and it does not become a question of law. The triers of fact, being faced with the witness or witnesses, may believe a part of the testimony and disbelieve another part; or they may draw an inference from the facts different from the inference that the Court would draw."

Following this rule the Circuit Court erred in substituting its conclusions for those of the Referee, who heard the case even if it could be said that the conclusions of the Court also might have been reasonably reached.

Another point raised by the plaintiffs was that in order for the machinists to work for any length of time, it was necessary for the cranemen and molders to work. But there was work for the machinists on the morning of June 10. The same issue was raised in Brown v. Maryland Unemployment Compensation Board (Md.), 55 A. (2d) 696, and the Court stated:

"If the claimants participated in the strike at all by refusing to cross the picket lines for one or two days when work was available they participated in the strike for its entire duration, and refusal to cross the picket line being a voluntary act they must accept the consequences of that refusal."

This appears to be a just determination of the issue since work was there for them at the time they failed to report. We are cited to no holding to the contrary.

It is also contended by the plaintiffs that they do not belong to the same grade or class of workers as the molders and that they are not barred from benefits by reason of the second proviso of the statute relating to exceptions. Since the point heretofore passed upon is determinative of the case, it is not necessary to take up this question.

For the reasons stated, it is the recommendation of the Commissioner that the judgment of the Circuit Court be reversed.

PER CURIAM:—The foregoing opinion of WOLFE, C., is adopted as the opinion of the Court. The judgment of the Circuit Court is accordingly reversed. *Anderson, P. J.*, and *Hughes* and *McCullen, JJ.*, concur.