(No. 31231

AMERICAN BRAKE SHOE COMPANY, Appellee, *vs.* FRANK ANNUNZIO, Director of Labor, *et al.,* Appellants.

*Opinion filed January 18, 1950.*

GUNN, J., specially concurring.

IVAN A. ELLIOTT, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, JAMES C. MURRAY, and A. ZOLA GROVES, all of Chicago, of counsel,) for appellants.

WINSTON, STRAWN, SHAW & BLACK, of Chicago, (GEORGE B. CHRISTENSEN, and NEAL J. McAULIFFE, of counsel,) for appellee.

Mr. JUSTICE FULTON delivered the opinion of the court:

This is an appeal by the Director of the Department of Labor of the State of Illinois from an order of the superior court of Cook County which reversed the action of the Director of Labor holding that certain employees of the American Brake Shoe Company, a corporation, were entitled to unemployment compensation benefits for the period from October 22, 1945, to November 20, 1945, inclusive.

In order for a proper consideration of this case, it is necessary for us to set forth briefly the facts. American Brake Shoe Company, which will hereinafter be referred to as the company, operated various establishments throughout the United States in the manufacture of steel forgings and, in October and November of 1945, operated at least five plants in the Chicago industrial area. The employees involved in this proceeding were die sinkers and were all employed at the Great Lakes Forge Division plant in Chicago. They were employees of Local 100 of Die Sinkers' Conference—AFL. Other employees of the company in its various plants were members of the United Farm Equipment and Metal Workers Union, CIO, and the United Automobile Workers of America, CIO. In September a labor dispute arose at another one of the company's plants in Chicago between the employees represented by the CIO unions and the company. On October 22, 1945, the UAW-CIO chapter at this other plant dispatched pickets of its own members to picket the premises of the company's other plants in the Chicago area. On the morning of October 22, 1945, from four to six pickets stationed themselves at the east and west entrances of the Great Lakes Forge Division plant immediately before the starting time of the first shift. These pickets carried various signs upon which were the following and other legends: "Solidarity will make Brake Shoe

come to terms." "United we will win." "Master contract for all Brake Shoe Plants in Chicago." These pickets continued thereafter in reduced numbers and at times there was only a single picket at each gate. On October 22, 1945, and subsequently, there was a detail of Chicago police at the gates of the Great Lakes Forge Division plant to maintain order. When the die sinkers arrived at the plant about 6:50 A.M. they saw the pickets at the gates customarily used by them. Their steward made some inquiry of the officials of the CIO union and was informed that the pickets were from the United Automobile Workers local union at another of the company's plants, and that they were conducting a strike in compliance with the labor laws. The steward testified that he did not enter the plant to work because he felt it was a legal strike and he also said he thought it was possible that he might have been harmed had he attempted to pass these pickets. He testified as follows: "* * * there was a picket line formed there, so we tried to find out what it was all about, so they told us that the fellows who were picketing were legally on strike so I didn't go in the plant. * * * I believe there were 6 or 8 pickets at the gate. that we go in. * * * There were policemen there, at least four at the entrance. * * * I am not exactly afraid of a picket line but nobody would want to be branded as a scab and that's what would happen if you go through a picket line. * * * We stayed out because it was a legal picket line." The witness further said: "Actually what I determined was that these fellows that were picketing were employees of the American Brake Shoe Company. We did not cross the picket line because there's a threat of violence. I was afraid of violence so I didn't cross. I stayed out because I determined that it was a legal picketing line and then I didn't want to cross it because it was a legal picket line. That's the reasons why I didn't go in."

The Die Sinkers' Conference had received no requests for co-operation with any other organizations and had made no offers of co-operation with any such organization. None of the die sinkers participated in the picketing in any way and they were not consulted either in advance or afterwards concerning the picketing of the plant. The die sinkers did not return to work until the pickets were removed.

This case presents squarely for determination the question of whether the failure to cross a picket line established by other employees of the same employer precludes employees who failed to cross the picket line from unemployment compensation benefits when those employees are members of an entirely different labor organization and have no interest in, or connection with, the labor dispute resulting in the picketing of the employer's establishment.

Section 7 of the Unemployment Compensation Act (Ill. Rev. Stat. 1947, chap. 48, par. 223,) provides: "An individual shall be ineligible for benefits— * * * (d) For any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, provided that this subsection shall not apply if it is shown that (1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work and (2). He does not belong to a grade or class of workers of which immediately before the commencement of the stoppage there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided, that if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are

conducted in separate departments of the same premises, each such department shall, for the purpose of this subsection, be deemed to be a separate factory, establishment, or other premises."

The Director of Labor found that the die sinkers were not participating in or financing or directly interested in the labor dispute which caused the stoppage of work, and that they did not belong to a grade or class of workers of which immediately before the commencement of the stoppage of work there were members employed at the premises at which the stoppage occurred who were participating in or financing or directly interested in the dispute. Another disqualification provided by section 7(a) of the Unemployment Compensation Act (Ill. Rev. Stat. 1947, chap. 48, par. 223 (a),) is that employees who voluntarily refrain from work are ineligible for compensation.

In view of the testimony by the only die sinker witness that the real reason that he and the employees of his group did not go to work was that they did not care to pass a picket line and be branded as a scab and "We stayed out because it was a legal picket line," we believe that the decision of the Director of Labor was contrary to the manifest weight of the evidence, and that the action of the superior court of Cook County should be affirmed.

In the case at bar it appears that police officers were stationed at the gate and that during the course of the picketing the die sinkers were informed that anyone who cared to cross the picket line could do so. It also appears that there was absolutely no overt act committed by the company whereby it precluded any employees who desired to come to work from entering the premises. In the case of *Outboard Marine & Mfg. Co.* v. *Gordon,* 403 Ill. 523, a somewhat similar situation was presented to this court, but in that case it appeared that the company, because it did not care to have any violence occur either to it or its

employees, agreed with the striking union that no one except certain employees who had a pass from the union would be permitted to enter the gates of the company. In that case we held that the company had, in fact, prevented its nonstriking employees from entering its property and performing work thereon, and that the employees were entitled to unemployment compensation.

It appears in the case at bar that the picketing was peaceful, that there was ample police protection and that the die sinkers were members of an entirely different union and could have, if they had chosen to do so, entered their place of employment without threat of bodily harm. Likewise there is nothing in the record to show that there was no work for them to perform or that the company desired that they stay away from work. We are aware of the fact that among members of unions the term "scab" is used to define an employed individual who does not respect a picket line, and that among union members when one is classified as a "scab" he is frequently ostracized and held in contempt by fellow union members. However, the term "scab" does not necessarily mean that one will suffer bodily harm.

It appears to us from the evidence of the sole witness from the Die Sinkers' Conference that the real reason for the die sinkers failing to report for work was that they did not care to be classified as "scabs." Peaceful picketing by employees to gain rights from employers is recognized as a legal activity but picketing coupled with violence is not recognized as a legal activity. In this case it appears that the die sinkers could have entered their place of employment without sustaining bodily harm and since this court will not assume that picketing normally will bring violence, therefore, it appears to us that the die sinkers voluntarily remained away from their employment because they did not care to be classified as "scabs" by fellow employees. Since the fear of such classification

appeared to be the motivation for their failure to enter their place of employment, it logically follows that they were either participating in the labor dispute by failing to cross the picket line or voluntarily remained away from their employment, either of which would disqualify them from compensation benefits. The die sinkers were unemployed solely because in accordance with their union principles they did not choose to work in a plant where certain employees from another plant of their employer were conducting picketing.

For the reasons stated in this opinion, the judgment of the superior court of Cook County is affirmed.

*Judgment affirmed.*

Mr. JUSTICE GUNN, specially concurring: I agree with the result reached but not with the reason on which it is based.