# LEXES et al. v. INDUSTRIAL COMMISSION et al.

No. 7623.   Decided April 29, 1952.   (243 P. 2d 964.)

See 39 C. J., Master and Servant, sec. 369. Refusal to work because of strike as involuntary unemployment within social security provisions. 48 Am. Jur., Social Security, Unemployment Insurance and Retirement Funds, sec. 36; 173 A. L. R. 490.

*Rawlings, Wallace, Black, Roberts & Black,* and *Dwight L. King,* all of Salt Lake City, for plaintiffs.

*Clinton D. Vernon,* Atty. Gen., *Fred F. Dremann,* and *Ray, Quinney & Nebeker,* all of Salt Lake City, for defendants.

WOLFE, Chief Justice.

Certiorari to the Board of Review of the Industrial Commission, to review its decision denying unemployment compensation benefits to plaintiffs.

The facts are as follows: Prior to June 25, 1950, switching and spotting of railroad cars upon the premises of the Garfield, Utah, plant of the American Smelting & Refining Co. (A. S. & R. Co.) was performed pursuant to contract by the Denver & Rio Grande Western Railroad (D. & R. G. W.). The railroad employees were members of the Switchmen's Union of North America. On June 25th, the Switchmen's Union "struck" the D. & R. G. W. Approximately nine switchmen affected by the strike, walked off their jobs at Garfield. The A. S. & R. Co. had anticipated such a possibility and had arranged by contract with Local Union No. 4347 United Steel Workers of America, C. I. O., which had jurisdiction over the A. S. & R. Co. employees, that the Steelworkers Union would take over the jobs vacated by the striking switchmen and perform such work, using equipment recently acquired by the A. S. & R. Co. The contract with the D. & R. G. W., being terminable at will, had been cancelled and there were no positions in the

plant operations which were being filled by railroad employees.

On June 28, 1950, the Switchmen's Union established picket lines at the gates of the plant. The Executive Board of the Steelworkers Union, Local 4347, had determined to honor such a picket line and the morning shift of A. S. & R. Co. employees stayed outside the plant upon encountering the pickets. Representatives of the Steelworkers Union conferred with the A. S. & R. Co. management suggesting that the afternoon and night shifts be advised of the situation and told not to report for work. Such information was broadcasted on various radios that afternoon and consequently most of the workers on the afternoon and evening shift did not report for work. The only reason for the closing down of the plant was the refusal of the employees to pass the picket lines established by the Switchmen's Union. No dispute of any kind existed between the smelting company and its employees, either as to wages or any condition of employment. Both the Switchmen's and Steelworkers Union were notified of the termination of the contract calling for switching and spotting services by railroad employees within the plant. Nevertheless the picket line remained until July 6th. The employees of the smelting company returned to work July 8, 1950.

Plaintiffs represent the A. S. & R. Co. employees who contend that they are eligible for unemployment compensation benefits for the period from June 25th through July 8, 1950. The salient portions of the Utah Employment Security Act provides as follows:

42-2a-4, U. C. A. 1943:

"An unemployed individual shall be eligible to receive benefits with respect to any week only if it has been found by the commission that: * * * (c) *He is able to work and is available for work.*"
42-2a-5,

"*An individual shall be ineligible for benefits* * * * (a) *For the week in which he has left work voluntarily without good cause,* is so found by the commission * * *.*" (Italics added.)

Plaintiffs contend that they did not leave work voluntarily without good cause, nor was there work available for them within the meaning of the statute. The reason given for refusing to cross the picket line was stated by one of the witnesses to be:

"Well, every union man on joining a union pledges that he will work for the betterment of organized labor and that he will not under any circumstances take another man's job and that he will cease work on the orders of his union and it is also a common belief among organized labor that what hurts one union man hurts another and to undermine the—for the C. I. O. for example to undermine the A. F. of L. Union by crossing their picket lines and aid in breaking their strike, would undermine all our rights."

Other testimony is to the effect that any man who crosses a picket line is considered a scab, a person devoid of honor, who cannot be trusted, hardly fit for the society of other working men; that Garfield is a union community where a scab would be socially ostracized. There was no evidence of violence when the morning shift encountered the pickets, but the plaintiffs testified that they feared a fight would start if someone attempted to cross it. Thus plaintiffs argue that these socio-economic reasons compelled them to honor the picket line and furnished "good cause" for their decision to remain away from work; that if work could only be obtained at the risk of violence or social ostracism then the work was not as a practical matter "available."

The claims supervisor of the Industrial Commission in denying the plaintiffs' application for unemployment compensation, stated as follows:

"You were unemployed because in accordance with your union principles you did not choose to cross the picket line which had been established by the Switchmen's Union. This choice is one which members of organized labor are frequently called upon to make and in the eyes of the Utah act, this kind of choice has never been deemed involuntary. You are therefore ineligible to receive benefits from June 25 through July 8, 1950."

In *Members Iron Workers Union of Provo* v. *Industrial Comm.*, 104 Utah 242, 139 P. 2d 208, and in *Olof Nelson Const. Co.* v. *Industrial Comm.*, ... Utah .. , 243 P. 2d 951, we have cited *Bodinson Mfg. Co.* v. *California Employment Commission*, 17 Cal. 2d 321, 109 P. 2d 935, 939. There a machinist's union refused to cross the picket line of the welder's union established at the Bodinson plant. The court held that the machinists were ineligible for unemployment compensation. The question was whether the claimant "left his work because of a trade dispute" as provided by the California statute. The court reasoned that the phrase implied that the employee is disqualified for benefits "only if he leaves his work voluntarily". Thus the issue was whether the employees who refused to pass the picket line acted of their own volition. Our statute provides that the individual shall be ineligible for benefits when he leaves work "voluntarily without good cause," and therefore the Bodinson decision is squarely in point. The decision of the court is expressed by the following quotations found at page 940 of 109 P. 2d:

"If the picket line was maintained within the limits permitted by law, as this one presumably was, no physical compulsion was exerted to prevent corespondents from working. They were unemployed solely because, in accordance with their union principles, they did not choose to work in a plant where certain of their fellow employees were on strike. Their own consciences and faith in their union principles dictated their action. This choice is one which members of organized labor are frequently called upon to make, and in the eyes of the law this kind of choice has never been deemed involuntary."

The "Utah Unemployment Reserve Law" as it was first known was enacted in 1935, Chapter 38, Laws of Utah 1935. Section 1 declared that the policy of the act was to lessen the burden of involuntary employment "which now so often falls with crushing force upon the unemployed worker and his family." The act was designed to establish "financial reserves for the benefit of persons unemployed through no fault of their own." At that time this nation was in the throes of a great economic depres-

sion. The purpose of providing unemployment benefits was twofold: first, to alleviate the need of the worker and his family who found no market for their services and were deprived of wages by the general business collapse; second, it was a "pump-priming" measure to provide increased buying power and thereby stimulate our economic system. In present times of prosperity, neither of these objectives would be served by granting benefits to the present claimants. Future times may present occasions when the cushioning effect of unemployment compensation may arrest the course of a narrowing downward economic spiral so as to make pump-priming in its raw form unnecessary. Labor's right to seek higher wages by concerted lawful economic pressure is recognized but the labor force which chooses to strike in order to enforce its demands cannot be classified as involuntarily unemployed. It is specifically disqualified from receiving compensation by statute. Those who are in sympathy with the striking body and stay away from their available jobs in order to uphold the reciprocal pact amongst laboring forces to honor each other's picket lines cannot logically be placed in any other category. We believe that consideration of the background and general purpose of unemployment legislation is what has prompted the courts to hold that the decision of an employee not to cross a picket line which surrounds his place of work cannot be deemed an involuntary act.

In the instant case, the claimants voluntarily remained away from work which was available to them because of their adherence to the union principle of honoring picket lines. There is no merit to the argument that because the switchmen's picket line was an illegal secondary boycott, it was the duty of the A. S. & R. Co. management to have it enjoined; that the failure to do so prevented the employees from gaining access to their place of employment. The Executive Board of the Steelworkers Union knew that there was no dispute existing between the A. S. & R. Co. and members of the Switchmens Union of North America.

They knew that there were no jobs on the premises being filled by railroad employees. Nevertheless, they voted to recognize the picket line and thereby add their own economic strength to the demands of the Switchmen's Union. In doing so, they not only participated in the work stoppage, but their action was the cause of it.

Insofar as claimant's eligibility for unemployment compensation benefits is concerned, it is immaterial whether claimant refuses to cross the picket line because of his own personal conviction that the Switchmen's Union picket line must be honored, or if his refusal to cross the picket line stems from his belief that his own union officials' (Executive Board Steelworkers Union, Local No. 4347) decision to honor the switchmen's picket line should be obeyed. In the final analysis, the Switchmen's strike only involves the claimant's grade, class, or group, *so as to cause his unemployment* when the claimant himself obeys his union officials' decision to honor the picket line. In either case it is a decision which calls for an exercise of claimant's volition and upon which choice depends his eligibility for benefits. He may need to balance, in the exercise of that volition, a loss of benefits as against the obloquy which it is claimed a refusal to honor the picket line of an outside union would draw down upon him.

There is no evidence of any violence occurring at the plant gates on the morning that the steelworkers met the pickets. The Union Executive Board's decision to honor the picket line was made five days prior to its establishment. The absence of violence or use of force by the pickets is shown by an incident which occurred on the morning of June 28th. While the morning shift of steelworkers was standing outside the gates of the plant, some A. F. of L. construction workers crossed the picket line without any trouble. Members of the Steelworkers Union went inside the plant and told the construction workers that they should not violate the picket line while the steelworkers were honoring it. The A. F. of L. workers

peacefully left the plant. The evidence in the record sustains the appeals referee's comment

"that it was not primarily fear of physical violence but strict adherence to union policy that kept the workers from crossing the picket line."

In *International Union of Operating Engineers, Local No. 3* v. *Utah Labor Relations Board*, 115 Utah 183, 203 P. 2d 404, we held that peaceful picketing is an exercise of constitutionally guaranteed free speech and is thus permitted under Section 49-1-16 (2), U. C. A. 1943, as amended, Laws of Utah 1947, ch. 66. The statute provides:

"(2) It shall be an unfair labor practice for an employee individually or in concert with others:    *    *    *

"(d) To hinder or prevent, by mass picketing, threats, intimidation, force, or coercion of any kind the pursuit of any lawful work or employment, or to obstruct or interfere with entrance to or egress from any place of employment    *    *    *."

We assume that picketing will be conducted within the limits prescribed by this statute.

Insofar as the unions are concerned, in unity there is strength and the overall aims of union negotiations are assumed to be advanced by a full and complete recognition of pickets. Regardless of how laudable these union principles may be, they cannot be construed as controlling the matter of eligibility of claimants for unemployment benefits. The view here adopted by this court has been expressed in other jurisdictions. In the case of *American Brake Shoe Company* v. *Annunzio*, 405 Ill. 44, 90 N. E. 2d 83, 85, the court stated:

"Since the fear of such classification [scabs] appeared to be the motivation for their failure to enter their place of employment, it logically follows that they were either participating in the labor dispute by failing to cross the picket line or voluntarily remained away from their employment, either of which would disqualify them from compensation benefits."

The Oregon Appeals Referee in case No. 46-RA-144, March 9, 1946 quoted at paragraph 8059 of CCH Unemployment Insurance Service, held that even though claimant is not a member of the striking union, he expresses interest and participation in the dispute which creates his unemployment by his refusal to cross the picket line at the factory where he was last employed.

The Supreme Court of Washington has stated: ■

"The mere fact that the passage through the picket lines was contrary to their union convictions was not enough to make their refusal involuntary, since they had a legal right to pass the lines if they so desired." *In re St. Paul & Tacoma Lumber Co.*, 7 Wash. 2d 580, 110 P. 2d 877, 884.

This position was reiterated in *Appeals of Employees of Pacific Tel. & Tel. Co.*, 31 Wash. 2d 659, 198 P. 2d 675. Although the specific statutory phrase governing disqualification differs in the states of Pennsylvania, Missouri and Indiana, the courts of those states also have held that the claimants' acts in honoring a picket line amounted to voluntarily leaving work without good cause. *Franke* v. *Unemployment Compensation Board of Review*, 166 Pa. Super. 251, 70 A. 2d 461; *Meyer* v. *Industrial Commission*, 240 Mo. App. 1022, 223 S. W. 2d 835, paragraph 8151 of CCH Unemployment Insurance Service; Indiana Board of Review, Decision No. 48-LDR-6, 4-18-49 quoted at paragraph 8163 of CCH Unemployment Insurance Service.

The decision of the Board of Review of the Industrial Commission denying the plaintiffs' application for unemployment compensation is affirmed. Costs awarded to defendants.

McDONOUGH, J., concurs.

WADE, Justice (concurring in the result).

I agree that compensation was properly denied on the ground that the plaintiffs either left their employment

voluntarily without good cause or they were involved in a strike. I agree with Mr. Justice CROCKETT that a person who wished to go to work might involuntarily refuse to cross a picket line to do so. On the other hand, these plaintiffs may have of their own free will refused to go to work because they believed that the cause of the strikers who established the picket line was just and they were willing to forego their benefits from working in order to help that cause. If such were the case, their failure to work would be voluntary and without good cause even though the picket line was sufficient to coerce them into leaving their work against their own free will. Whether the evidence here shows that this work stoppage was voluntary or not, I do not express an opinion. However, if there had been no vote to honor the picket line by plaintiffs' union, and plaintiffs were coerced by the picket line to leave their work against their free will, then I believe that they would be entitled to compensation.

CROCKETT, Justice (concurring in the result).

The defendant Commission based its denial of compensation to the plaintiffs upon Section 42-2a-5, U. C. A. 1943, which provides a worker shall be ineligible for benefits if:

"(a) * * * he has left voluntarily without good cause, * * *."

The denial of compensation was apparently based on this finding:

"You were unemployed because in accordance with your union principles you did not choose to cross the picket line which had been established by the Switchmen's Union."

The opinion of the CHIEF JUSTICE affirms the ruling on that ground.

It seems to me that such finding and determination rests upon an entirely false premise: "That the claimants actually had freedom of choice." To say that claimants re-

fused to work "voluntarily and without good cause" is a fiction which wholly ignores realities. The question, Did they have "good cause" for not working? should be correlated to the facts of life. The correct test to be applied is: Was the cause such as would justify a reasonable person in leaving his work?

A forthright and intelligent exposition of the question of voluntariness in refusing to work is contained in *Bliley Electric Co.* v. *Unemployment Compensation Board of Review,* 158 Pa. Super. 548, 45 A. 2d 898, 903:

> "When therefore the pressure of real not imaginary, substantial not trifling, reasonable not whimsical, circumstances compel the decision to leave employment, the decision is voluntary in the sense that the worker has willed it, but involuntary because outward pressures have compelled it. Or to state it differently, if a worker leaves his employment when he is compelled to do so by necessitous circumstances or because of legal or family obligations, his leaving is voluntary with good cause, and under the act he is entitled to benefits. The pressure of necessity, of legal duty, or family obligations, or other overpowering circumstances and his capitulation to them transform what is ostensibly voluntary unemployment into involuntary unemployment."

See also Schindler-Collective Bargaining and Unemployment Insurance Legislation, 38 Col. L. Rev. 858; Lesser, Eligibility and Disqualification, 55 Yale L. J. 115, 158, Lesser, after discussing a number of the positions that administrative bodies have taken in interpreting unemployment compensation acts, comes to the conclusion that "good cause" as used in such acts means such "cause" as would justify a reasonable person in leaving his work.

In order to make a fair analysis of the situation, it is necessary to consider it from the point of view of the claimant. According to the evidence in this proceeding, union members generally are bound by an oath that they will not violate picket lines. It is a well known fact that this obligation is seriously and universally accepted by members of organized labor and that they do not and will

not go through picket lines. After being advised that his union was honoring the picket line, the claimant had two choices: (1) to attempt to go through the picket line and work; and (2) to honor the picket line and refuse to work. Either choice would have compelled him to deal with the eventualities. If he abided by the admonition of his union and kept faith with his obligations to it, the likelihood was that the dispute would be ironed out within a reasonable time and he would be back to work with no great harm done. If he chose the other alternative, to refuse to honor the picket line, he was faced with certain other serious considerations.

First and most immediate of these would have been the fear of actual violence. There was testimony that a large group of union men were there; that they resented and were emotionally disturbed by men crossing picket lines; that the claimants feared such violence; and that some thought they would have been stopped somehow. It is plausibly argued, and perhaps correctly as a matter of law, that in the absence of evidence to the contrary, we must assume that the picketing would be carried on peaceably and within the limits permitted by law. This assumption has an element of danger in it which should be pointed out. If men are to be denied unemployment compensation for refusing to go through peaceful picket lines, it requires only a second thought to suggest, that where the families of workers may be threatened with hunger or want merely because the picket line is peaceful, it wouldn't take much of a disturbance to change that situation into a picket line that would not be regarded as peaceful and the employee would then be justified in not crossing it and compensation could be awarded. I doubt the wisdom of establishing a rule which might tempt men at the expense of their family's welfare to try to cross picket lines or otherwise cause disturbances which may render the picket line other than peaceful. Unsatisfactory as the situation existing above would be, there are other reasons, which seem more im-

portant still, why it would be unrealistic to expect a workman to cross the picket line.

The second matter of serious concern to the claimant would have been the economic consequences. From that point of view, it would seem inadvisable because he would in all likelihood lose his union membership, and as soon as the dispute was settled, lose his job. Not only would he lose that employment, but also be unable to procure other similar employment where union men were used. Even if he continued to work on this same job, he would have engendered the ill will and disapproval of his fellow workers and always thereafter suffer the stigma of being regarded as a man who would not abide by his obligations and keep faith with the group; be known as and called a "scab" and other epithets still less complimentary in character. Such disapproval might bring all manner of ill treatment and reprisals from his coworkers who kept faith with the union and honored the picket line so that it would be virtually impossible to work with them.

A third sphere in which he would suffer serious disadvantage is the social consequences. It must be realized that one of the strongest motivations of human conduct is the desire for approval by one's associates, not only in his work, but more important, socially, for himself and his family. The town of Garfield and other adjacent towns where these employees reside are union towns. The claimant and his family would be subject to social disgrace and ostracism in all their social contacts, even the church and the children in school. It may be difficult for persons who are not acquainted with this atmosphere to sense the full implication of the social sanctions aimed against one who is regarded as disloyal and traitorous to the group interests. Union members would undoubtedly rather go to work, suffering from a serious illness, or even a broken leg, than go through a picket line, and could do so with less dire consequences to themselves and their families.

Not presuming to pass upon such matters at this time, I venture that if a confession in a criminal case were exacted, or a contract procured to be signed, or a will to be executed, under pain of the consequences which threatened claimants if they passed this picket line, such documents would be invalid because of duress and undue influence. Yet in this area of the law, we are asked to accept the idea that these men, voluntarily and *without good cause,* failed to go to work.

Even if the employee had the moral courage and fortitude to go against the whole organization of men with which he worked, most reasonable men would believe it foolhardy to do so in view of the possible consequences. To require a man to suffer the indignity, disgrace and risk, socially and economically, involved in going through a picket line, places a burden on them that they will not bear.

A sound rule of law cannot be established upon the false assumption that because men have a technical legal right to go through a picket line, that they will do it and suffer the consequences. Whether the law regards it as "good cause" or not, the cause is just sufficient that union men uniformly are controlled in their conduct by it. I, therefore, think it manifest beyond peradventure of doubt that there is no basis in fact or reason for the finding that the refusal of these claimants to work could properly be classified as "voluntary and without good cause".

The finding of the Commission seems to clearly indicate that its determination was based on the freedom of choice of the individual. However the same reasoning applies if it be contended that the choice not to cross the picket line was made by the union for the claimant.

The foregoing has been set out because I believe the order of the Commission and the prevailing opinion affirming it are based upon the wrong statute and erroneous reasoning.

Notwithstanding what has been said above, it seems unquestionable that the claimants are disqualified from receiving unemployment compensation under another section of our statute which applies to them. Section 42-2a-5, U. C. A. 1943 provides:

"An individual shall be ineligible for benefits   *   *   *

"(d) For any week in which it is found by the commission that his unemployment is due to a stoppage of work which exists because of a strike involving his grade, class, or group of workers   *   *   *."

Although the inquiry did not proceed upon the theory that claimants engaged in the strike, the undisputed facts show that this was the case. Neither the fact that they had no dispute with the employer, nor that their work stoppage was not called a strike, are controlling. A strike is generally defined to be a concerted action of employees in withholding services from their employer. Any such concerted action in refusing to perform services is a strike, no matter what the action may be called, nor for whatever purpose it may have been initiated.

The executive board of the union, when informed that the Switchmen's Union was going to establish a picket line, voted to honor it, and to refrain from reporting to work and so notified its members. A committee of union members, representing the union, went into the plant for the purpose of informing employees therein that they should leave their work because of the picket line. There is no theory under which such concerted action in refusing to work can be interpreted and classified as anything other than a strike. The legislature has expressly provided in Section 5(d) hereinabove referred to that under such circumstances unemployment benefits shall not be awarded. The wisdom and purpose of that provision is not our present concern.

It will be noted that the determination made in the case of *Bodinson Mfg. Co.* v. *California Employment Comm.*, 17 Cal. 2d 321, 109 P. 2d 935, 940, cited in the main opin-

ion, was grounded on the fact that claimants left their work because of a trade dispute. The court said:

> "Fairly interpreted, it [the statute] was intended to disqualify those workers who voluntarily leave their work because of a trade dispute. Co-respondents in this proceeding in fact 'left their work because of a trade dispute' and are consequently ineligible to receive benefit payments."

In *American Brake Shoe Company* v. *Annunzio,* 405 Ill. 44, 90 N. E. 2d 83, 85, claimants who did not cross a picket line set up by members of another union were held disqualified, the courts saying,

> "\* \* \* that they were either participating in the labor dispute \* \* \* or voluntarily remained away from their employment, \* \* \*."

The statutes of both California and Illinois include the term "trade dispute" with "strike" as a disqualification. Note also the Oregon Appeals Referee case referred to in the prevailing opinion which states clearly that the basis of the holding is that the claimant honoring the picket line is participating in the dispute. It is submitted that most of the cases cited by defendants are actually decided on that ground, which as I have attempted to demonstrate, is the logical basis upon which the award is denied.

From the undisputed facts as shown by the claimants themselves, there can be no escape from the facts that they were engaged in conduct which must be classified as a strike. Therefore, no purpose could be served by sending the matter back for further inquiry upon the matter of whether a strike existed as contrasted to refusing to work "voluntarily and without good cause".

For the reason that the conduct of the claimants involved a strike of the grade, class or group of workers to which they belonged, I concur in affirming the order of the Commission.

HENRIOD, J., not participating.