James T. MILLS et al., Plaintiffs,

v.

Carlyle F. GRONNING, F. Warren Nues-
meyer and James F. Hannan, acting for
and on behalf of The Board of Review,
Department of Employment Security,
Industrial Commission of Utah and Ken-
necott Copper Corporation, Defendants.

William C. BRINKERHOFF et
al., Plaintiffs,

v.

Carlyle F. GRONNING, F. Warren Nues-
meyer and James F. Hannan, acting for
and on behalf of The Board of Review,
Department of Employment Security,
Industrial Commission of Utah and Ken-
necott Copper Corporation, Defendants.

Nos. 15621, 15622.

Supreme Court of Utah.

June 26, 1978.

Arthur F. Sandack of Sandack & Sandack, Salt Lake City, for both Mills and Brinkerhoff.

Stephen K. Schroeder of Parsons, Behle & Latimer, Salt Lake City, for Kennecott.

Robert B. Hansen, Atty. Gen., Floyd G. Astin, Sp. Asst. Atty. Gen., Salt Lake City, for Dept. of Employment Security.

MAUGHAN, Justice:

■ These two consolidated cases involve appeals from the Board of Review affirming decisions of the Appeals Referee. The referee denied claimants unemployment compensation for the period in which claimants were receiving, had received, or were entitled to receive remuneration in the form of accrued vacation pay. The decisions of the Board of Review are affirmed. All references are to U.C.A., 1953, as amended.

Each of the claimants was employed by Kennecott Copper Corporation, and each was a member of or worked under a collective bargaining agreement negotiated by a labor union. Each union was the sole bargaining agent of its members with respect to wages, hours, and other conditions of employment. The collective bargaining agreements between Kennecott and the unions provided for vacations. The length of the vacation period ranged from one to five weeks depending upon the number of years of service with Kennecott.

The following is an example of the type of provisions found in all the collective bargaining agreements:

(A) In any calendar year, the company may shut down all or any of the plant or the operations for two weeks for vacation purposes. In any year in which there is to be a vacation shutdown, a notice of the shutdown is to be given on or before March 31.

(1) The notice shall contain: (a) The date of the shutdown, which dates must fall between June 15 and August 15; (b) The plants or operations or parts thereof to be shut down and; (c) The approximate number of employees in those classifications which will be required for repair, maintenance or other work during the shutdown period.

(B) Employees needed for repair or maintenance work during a vacation or shutdown shall be selected on plant, departmental or classification seniorities as the parties shall decide, except that craftsmen shall be retained on a craft seniority basis to fill the necessary craft jobs during such vacation shutdown.

(C) *Employees* not required for repair, maintenance or other work during the vacation shutdown period and *who are eligible for vacation shall be scheduled to take their vacation during the shutdown period. However, any employee who is eligible for vacation, but who does not desire to take his vacation during the vacation period, may take his vacation at some other date.* In scheduling the order of vacations an employee's seniority shall be considered. Vacation dates shall be subject to approval of the company. [Emphasis supplied.]

Each of the collective bargaining agreements contained a provision for bonuses for employees who elected to take their vacations at times other than the vacation shutdown period. The amount of the bonus varied according to the time of year during which the vacation was scheduled.

On December 14, 1976, Kennecott published and posted a notice that operations would be shut down from June 13, 1977, to July 3, 1977. Thereafter, the company ad-

hered to the announced schedule. The period from June 13 through June 18, 1977, was a maintenance shutdown. The period from June 19 through July 2, 1977, was pursuant to the vacation shutdown provisions of the collective bargaining agreements. Each of the claimants had accrued eighty or more hours of vacation time as of January 1, 1977. Each claimant elected to take his vacation at some time either prior to or after the vacation shutdown. The distinction between the claimants under the *Mills* appeal and the *Brinkerhoff* appeal is that the claimants under the latter presented evidence to prove the circumstances under which they took vacations. This for the purpose of showing why they were taken at a time other than the shutdown period.

As to those claimants under the *Mills* appeal, the referee found notice of the pending shutdown was given in December, 1976, and the scheduling of the vacations was done thereafter. Each claimant was given the option as provided in the collective bargaining agreement to take his vacation during the shutdown, or at some other time. Each claimant chose another vacation period with knowledge he would not be entitled to further compensation from the company during the shutdown period.

The referee concluded there is an expressed legislative intention, in 35–4–5(h), to deny unemployment benefits to claimants who were entitled to vacation pay during a period of unemployment. As to the claimants who took their vacations before the vacation shutdown, the referee reasoned that to allow benefits would ignore the declared public policy of this state; by permitting payment of unemployment benefits during periods when the claimants did not receive their usual wages, because of the employee's own volition and under circumstances within the employee's control. The referee found that such was not the purpose of the unemployment insurance program. He held each claimant was not eligible for benefits during the shutdown period. This because of his entitlement to vacation pay, which he would have received during the shutdown period, but for his election to take vacation at another time.

The claimants under the *Brinkerhoff* appeal alleged circumstances beyond their control in scheduling their vacations. They urged their circumstances constituted an exception to the general rule set forth in the *Mills* decision. The appeals referee ruled the application of 35–4–5(h) to the question of vacation entitlement, during the plant shutdown, was based on the volitional nature of the decision to take vacation at some time other than the shutdown period. The referee also ruled a claimant who took his vacation during a period of illness, and after exhausting any sick leave to which he might have been entitled, did so for compelling reasons not within his control. In such instances, the disqualifying provision of 35–4–5(h) would not be applicable.

All but nine of the claimants, appealing in Brinkerhoff, presented evidence as to the reason they took their vacation at a time other than the plant shutdown. The referee applied the volitional standard and found the circumstances were not unique and compelling; therefore, he denied unemployment compensation benefits.

On appeal claimants contend the language of 35–4–5(h) has been misconstrued, and the plain meaning and intent of the law ignored.

35–4–22(m) provides:

"Unemployment" (1) An individual shall be deemed "unemployed" in any week during which he performs no services, and with respect to which no wages are payable to him, or in any week of less than full-time work if the wages payable to him with respect to such week are less than his weekly benefit amount. . . ·

35–4–5, provides:

An individual shall be ineligible for benefits or for purposes of establishing a waiting period:

\*    \*    \*    \*    \*    \*

(h) For any week with respect to which he is receiving, *has received,* or *is entitled to receive* remuneration in the form of:

(1) Wages in lieu of notice, or a dismissal or separation payment; or

(2) *Accrued vacation* or terminal leave payment. [Emphasis supplied.]

A review of cases cited by the parties from other jurisdictions is not conducive to the resolution of the issues in the instant cases. This because of the distinct statutory provisions, or combinations thereof, set forth as the foundation of those decisions.

Although not precisely in point, the cases of *Olof Nelson Construction Co. v. Industrial Commission*[1] and *Lexes v. Industrial Commission*[2] are instructive as to the test to apply to the various disqualification provisions in the unemployment compensation act. This Court observed the declared policy of the act was to establish financial reserves for the benefit of persons unemployed through no fault of their own. The provisions disqualifying employees from compensation were to prevent workers from obtaining benefits when there was work available which they declined to accept. This Court ruled:

Our conclusion is that the various disqualification provisions of our Employment Security Act reveal that the underlying legislative intent is for the commission to determine the claimant's eligibility by adhering to the volitional test announced in *Bodinson,* [17 Cal.2d 321, 109 P.2d 935], *Bunny's Waffle Shop* [24 Cal.2d 735, 151 P.2d 224] and *McKinley* [34 Cal.2d 238, 209 P.2d 602] cases in California. . . .[3]

In *Olof Nelson* and *Lexes* the disqualification provision interpreted by this Court involved unemployment due to a stoppage of work caused by a labor dispute. This Court adopted the fundamental theory as set forth in California, viz., disqualification for benefits depends upon the fact of voluntary action by the claimant. The form of cessation of employment was deemed not controlling, the determinative factor was the volitional cause of the work stoppage, viz., although an employee may have left work by his own choice, the choice was not freely made but was compelled by the economic weapon which the employer used.

In the instant cases, the employees, through their collective bargaining agents, agreed that those eligible for vacation "shall be scheduled to take their vacation during the shutdown period." However, an eligible employee was permitted in permissive terms to express a desire to take his vacation at some other date. Thus, the time of entitlement to vacation pay was mutually agreed to be during the vacation shutdown. However, on a volitional basis the employee had the option to designate another time to take his vacation and receive his pay. Nevertheless, his unemployment at the time of the vacation shutdown was the result of voluntary action by the employee and was not caused by some coercive factor or economic influence beyond his control. The claimants either had received or were entitled to receive remuneration in the form of accrued vacation pay during the vacation shutdown and were thus ineligible for benefits under 35–4–5(h).

The express language of 35–4–5(h) indicates a legislative intent that although the week of cessation of work may not coincide with the actual payment of accrued vacation pay, if remuneration has been received or a claimant is entitled to so receive it, the claimant is ineligible for benefits under the act. Claimants' argument that the effect of the decision to deny benefits was an improper allocation of vacation payments to the shutdown period in contravention of the statute is without merit in light of the express language in 35–4–5(h).

Claimants further contend the denial of benefits was in violation of 35–4–18(a), wherein it is provided:

---

1. 121 Utah 525, 243 P.2d 951 (1952).

2. 121 Utah 551, 243 P.2d 964 (1952).

3. At p. 538 of 121 Utah, at p. 958 of 243 P.2d.

Any agreement by an individual to waive, release, or commute his rights to benefits or any other right under this act shall be void. . . .

Claimants urge this section prohibits the Board of Review from relying on any provision in the collective bargaining agreement as a basis to deny unemployment benefits. They aver a collective bargaining agreement is invalid to the extent its provisions are construed to waive, release or commute unemployment compensation benefits. They rely on *Southwestern Bell Telephone Company v. Employment Security Board of Review*[4] and the modification of the court's prior ruling in *Goodyear Tire & Rubber Company v. Employment Security Board of Review.*[5]

The decision in the *Goodyear* case is distinguishable from the instant one in that Kansas had no statutory disqualification provision concerning accrued vacation pay similar to 35–4–5(h). The court in *Goodyear* determined the claimants were voluntarily unemployed solely by their status as set forth in the collective bargaining agreement identifying them as being considered on a leave of absence.

Here, the collective bargaining agreement did not define the status of the claimants, it merely set forth the terms and conditions of employment, as mutually agreed by the parties. The agreement did not waive, release or commute any unemployment benefits. The claimants were disqualified by the terms of a specific statutory provision, 35–4–5(h), as applied to the facts established under the collective bargaining agreement.

■ Claimants in the *Brinkerhoff* appeal contend the exception to the volitional standard of Mills established by the referee is too harsh and narrow. The exception was confined to unique and compelling circumstances over which the claimants would have little or no reasonable control in their determination to take their vacation before the shutdown. They urge a more appropriate standard would be to allow benefits for those who scheduled their vacations prior to the shutdown, for legitimate reasons, in good faith, with no intent to take advantage of the Employment Security provisions. Thus individuals, who vacationed for purposes of attending to personal problems or business should be allowed benefits. We cannot agree.

The exception as applied by the referee is consonant with the volitional standard, viz., claimant must show there were no reasonable alternatives to the use of his vacation time, knowing it would leave him without regular pay during the plant shutdown. Otherwise, claimants' circumstances are not so compelling as to remove the volitional nature of his election to take vacation time prior to the shutdown.

The exception is analogous to the compelling reasons, i. e., good cause for claimant voluntarily leaving his work as set forth in 35–4–5(a). In *Denby v. Board of Review of the Industrial Commission,*[6] this Court quoted the following:

What is 'good cause' must reflect the underlying purpose of the act to relieve against the distress of involuntary unemployment. The seeming paradox of allowing benefits to an individual whose unemployment is of his own volition disappears when the context of the words is viewed in that light. The Legislature contemplated that when an individual voluntarily leaves a job under the pressure of circumstances which may reasonably be viewed as having compelled him to do so, the termination is involuntary for purposes of the act. In statutory contemplation he cannot then reasonably be judged as free to stay at his job. . .

■ We further explained "good cause" was limited to those instances where the

---

**4.** 210 Kan. 403, 502 P.2d 645 (1972).

**5.** 205 Kan. 279, 469 P.2d 263 (1970).

**6.** Utah, 567 P.2d 626, 630 (1977).

unemployment was caused by external pressures so compelling a reasonably prudent person, exercising ordinary common sense and prudence, would be justified in quitting under similar circumstances. In addition, an employée with grievances about his employment, in order to have good cause, must indicate an effort to work out the problems, unless he can demonstrate the futility of such an effort.

ELLETT, C. J., and CROCKETT, WILKINS and HALL, JJ., concur.